REVISED OCTOBER 1, 2001

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 00-60434

_____

TEXAS OFFICE OF PUBLIC UTILITY COUNSEL; NATIONAL ASSOCIATION OF STATE UTILITY CONSUMER ADVOCATES,

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

Respondents.

On Petition for Review of a Final Order of
the Federal Communications Commission

September 10, 2001

Before EMILIO M. GARZA and PARKER, Circuit Judges, and ELLISON,[*] District Judge.

EMILIO M. GARZA, Circuit Judge:

This petition for review of the CALLS Order[1] represents the latest challenge to the Federal

_____

[*]       District Judge of the Southern District of Texas, sitting by designation.

[1]       The CALLS Order is officially named *In the Matter of Deployment of Access Charge Reform, Price Cap Performance Review for Local Exchange Carriers, Low-Volume Distance Users,*

Communication Commission's implementation of the Telecommunications Act of 1996, Pub.L. No. 104-04, 110 Stat. 56 (codified as amended in scattered sections of title 47, United States Code) ("1996 Act"). The Texas Office of Public Utility Counsel ("TOPUC") and the National Association of State Utility Consumer Advocates ("NASUCA"), along with intervenor Consumer Federation of America ("CFA") (collectively, "Petitioners"), claim that the CALLS Order violates the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) as well as the substantive provisions of the 1996 Act. We affirm the CALLS Order in most respects, but we remand for further analysis the portions regarding the $650 million Universal Service Fund and the X-Factor.

## I

We must briefly review the regulatory regime of the telephone industry to better understand the issues presented in this petition. The telephone industry is comprised of two sets of carriers. Local exchange carriers ("LECs") provide local basic telephone service, while interexchange carriers ("IXCs") offer long-distance service. Since the divestiture of AT&T in 1984, robust competition has existed in the long-distance market with IXCs trying to recruit new customers and lure subscribers from each other. On the other hand, LECs until recently had natural monopolies on local service in their respective regions, because they own the network infrastructure necessary to make telephone calls. The prohibitive capital costs involved in laying out a separate infrastructure deterred potential competitors from entering the local service market. The 1996 Act made competition in the local basic service market one of its main goals. Congress prodded incumbent local exchange carriers

_and Federal-State Joint Board on Universal Service_, Sixth Report and Order in CC Docket No. 96-262 and 94-1, and Report and Order in CC Docket 99-249, and Eleventh Report and Order in CC Docket 96-56, 15 FCC Rcd. 12962 (released May 31, 2000). The order derives its appellation from the Coalition of Affordable Local and Long Distance Service ("CALLS"), a group of local and long-distance providers that helped draft the initial proposal.

("ILECs")—that is, LECs like the Baby Bells which own the infrastructure—to provide cost-based use of their network to companies that wanted to enter the local service market. In return, Congress allowed ILECs, which had previously been barred from offering long-distance service in their home regions, to enter that market.

The 1996 Act's provision of allowing LECs to use ILECs' infrastructure resembled an arrangement already shared by IXCs and ILECs: IXCs rely on ILECs' network to originate and terminate long-dist ance calls. More technically, the IXCs use the "local loop," which refers to telephone wires running from a person's telephone to the local telephone switch. Whenever someone makes a long-distance phone call, he or she taps into the local network, where the call is then routed between a LEC local switch and an IXC switch. The costs incurred by the ILECs in providing the use of this infrastructure are called "loop costs."

Two sources of revenues allow the ILECs to recover the loop costs. First, all end-users of basic local service pay a flat Subscriber Line Charge ("SLC") that appears in their monthly telephone bills. Prior to the CALLS Order, the FCC capped the SLC at $3.50 per month: ILECs can charge less than $3.50 per month, but it cannot levy an access charge above that amount. The SLC alone is insufficient to defray the loop costs entirely. Thus, the FCC assesses an access charge against IXCs, which in turn usually pass down these costs to end-users. At first, the FCC levied a traffic-sensitive fee called the Common Carrier Line Charge ("CCL") against IXCs. The FCC later replaced the CCL with the flat-rate Presubscribed Interexchange Carrier Charge ("PICC"). *See Access Charge Reform Order, Price Cap Reform Performance Review for Local Exchange Carriers, Transport Structure and Pricing, End User Common Line Charges*, CC Docket Nos. 96-262, 94-1, 91-213 and 95-72, First Report and Order, FCC 97-158, 62 Fed. Reg. 31867 (released May 16, 1997) ("Access

Charge Reform Order"). The FCC determined that high-volume long-distance callers did not financially burden the network more than low-volume callers, but were nevertheless being penalized by a traffic-sensitive CCL charge. The FCC believed that the flat-rate PICC more accurately represented the true costs incurred by long-distance callers.

In addition to fostering competition in the local telephone service market, the 1996 Act had another key goal of continuing the provision of affordable universal service to all Americans. Traditionally, the phone bills of poor and rural customers have been implicitly subsidized by rate manipulation. High-volume long-distance callers and urban residents pay artificially higher phone bills to subsidize and support universal service for others. Congress recognized that these implicit subsidies could not continue under the market-based regime ushered in by the 1996 Act. In a competitive market, a carrier that subsidizes rural or poor customers by charging below-cost rates while billing above-cost rates to urban customers will be undercut by a competitor offering at-cost rates to urban end-users. Congress wanted to continue subsidizing universal service, but in a way more consistent with the market-oriented reforms. The 1996 Act thus required that the implicit subsidy system of rate manipulation be replaced with explicit subsidies for universal service. To implement the goals of the 1996 Act, the FCC issued a series of orders.

The FCC first issued its Access Charge Reform Order. As noted before, the order abolished the traffic-sensitive CCL fees assessed against IXCs, and replaced them with the flat-rate PICC. By ensuring that access charges more accurately reflected the actual costs incurred, the FCC hoped that it would facilitate the shift to a competitive market. The order also increased the SLC cap for multi-line business customers on the assumption that they could afford such a price increase. It, however, did not increase the SLC cap for primary residences and single-line businesses. Several IXCs

petitioned for review of the Access Charge Reform Order, alleging, among other things, that the failure to increase the SLC cap on primary residential and single-line businesses amounted to new implicit subsidies. The Eighth Circuit upheld the Access Charge Reform Order in part on the ground that the 1996 Act's commitment to universal access constrained the FCC from raising the SLC price-cap on other lines. *See Southwestern Bell Tel. Co. v. FCC*, 153 F.2d 523 (8th Cir. 1998) (citing 47 U.S.C. § 254(b)'s statement of affordable universal access). Noting that the order was a transitional plan only, the court further upheld the FCC's decision to rely on market forces rather than on comprehensive cost analysis in changing its access charge policy.

The FCC also issued *In re Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, Report and Order, 12 FCC Rcd. 8776 (1997) ("Universal Service Order"). This order emphasized that implicit subsidies for universal service should be gradually removed from interstate access charges, and replaced with an explicit universal service fund derived from percentage-based fees levied against telecommunications carriers. This Circuit remanded parts of the order, but we upheld the requirement that LECs must reduce access charges by an amount commensurate with the money received for the explicit universal service fund. *See Tex. Office of Pub.Util. Counsel v. FCC*, 183 F.3d 393 (5th Cir. 1999) ("*TOPUC I*").

Finally, the FCC addressed the issue of the "X-Factor" in its *In the Matter of Price Cap Performance Review for Local Exchange Carriers*, CC Docket 96-262, Fourth Report and Order, 12 FCC Rcd 16,642 (1997) ("Price Cap Review"). FCC had annually reduced LECs' price-caps by imposing what it dubbed the X-Factor, a percentage number that represented the LECs' increase in productivity minus the rate of inflation. By lowering the price-caps (and hence the amount that LECs could charge consumers), the X-Factor pressured LECs to become more efficient and to lower their

costs. In effect, the X-Factor passed down the savings from the LECs' increased productivity to the consumers. In its Price Cap Review, the FCC raised the X-Factor to 6.5 percent. On petition for review, the D.C. Circuit found the increase to be arbitrary and capricious because the FCC did not provide sufficient evidence of increased productivity by the LECs to warrant the 6.5 percent figure. *See United States Tel. Ass'n v. FCC*, 188 F.3d 521 (D.C. Cir. 1999) ("*USTA*"). It remanded this issue back to the FCC.

While revisiting the two remanded orders from *USTA* and *TOPUC I*, the FCC considered and adopted the CALLS Order, a five-year transitional plan intended to help resolve the thorny issues of access charges. This order originates from the work of the Coalition for Affordable Local and Long Distance Service ("CALLS"), a group of major IXCs and ILECs. Although ILECs and IXCs traditionally have held opposing views on telecommunications reform, they worked together in jointly presenting the CALLS proposal. The FCC conducted a notice-and-comment proceeding pursuant to the Administrative Procedure Act ("APA") by soliciting public comments on the proposal and receiving dozens of comments. After making some changes, the FCC submitted a modified CALLS proposal, and again solicited comments but on an abbreviated schedule. Several weeks later, the FCC issued the final CALLS Order.

The CALLS Order promulgates four key changes, all of which are challenged in this petition for review. First, the FCC abolishes the PICC fees assessed against IXCs. Second, to compensate for the loss of revenues from the elimination of the PICC, the order raises the SLC price cap for primary residential lines. It will increase from $3.50 to $6.50 over a period of several years. The FCC changed the fee structure, believing that it would encourage more competition and lead to lower rates overall for consumers. Third, the FCC reintroduces a 6.5 percent X-Factor, but switches it from

a productivity proxy to a non-productivity-based mechanism for rate reduction. Fourth, it establishes a transitional $650 million Universal Service Fund to provide explicit subsidies for poor and rural customers.

The parties challenging the CALLS Order include the Texas Office of Public Utility Counsel, as well as the National Association of State Utility Consumer Advocates and the intervenor Consumer Federation of America, both of which are consumer advocacy groups.[2] In their petition, they make two broad challenges against the order. The Petitioners first contend that the CALLS Order did not comport with the APA requirements. They characterize the CALLS Order as the product of a surreptitious political deal between the respondent FCC and the respondent-intervenor CALLS Coalition. The Petitioners also challenge the order on substantive grounds, claiming that it betrays, among other things, the 1996 Act's requirement of affordable universal access. We first address the substantive statutory challenge, and then the procedural objections to the CALLS Order.

## II

In reviewing the Petitioners' substantive claims, we apply the two-step analysis set forth in *Chevron U.S.A. Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-2783, 81 L.Ed.2d 694 (1984). In step one, we look to see whether Congress has spoken directly on the precise question at issue. *See id.* at 843, 104 S.Ct. at 2781. If Congress has done so, we must "give effect to [Congress'] unambiguously expressed intent." *Id.* at 843, 104 S.Ct. at 2781. If the

---

[2] The Petitioners have filed two opening briefs: TOPUC and CFA jointly filed a brief, while NASUCA filed separately. For the purpose of brevity, this opinion will not attempt to identify the specific arguments made by each brief, and will instead refer to them collectively as the Petitioners' argument or brief. Similarly, the respondents in the case, the FCC and the CALLS Coalition have filed separate briefs, but we will not individually identify the arguments made by each respondent.

statute is ambiguous as to the question at issue, we move to the second step of the *Chevron* analysis to determine "whether the agency's answer is based upon a permissible construction." *Id.* at 843, 104 S.Ct. at 2782. Under this second step, we can reverse the agency's decision only if it was arbitrary, capricious or manifestly contrary to the statute. *See id.* at 844, 104 S.Ct. at 2782. The question is not whether we might have preferred another way to interpret the statute, but whether the agency's decision was a reasonable one. *See MCI Telecomm. Corp. v. FCC*, 675 F.2d 408, 413 (D.C. Cir. 1982).

We address in order the Petitioners' three main objections to the CALLS Order: whether the SLC price cap increase violates § 254(b)(1) and § 254(i)'s purported affordability mandate; whether it contravenes § 254(k)'s prohibition against unreasonable allocation of joint and common costs; and whether the 1996 Act requires the FCC to conduct a comprehensive, forward-looking study.

**A**

The Petitioners object to the increase in the SLC caps for residential and single-line business customers, alleging that it violates the affordability mandate of 47 U.S.C. § 254 and arbitrarily reverses the long-settled agency policy of ensuring affordable universal service. We hold that the increase in the SLC price cap does neither: the FCC has reasonably interpreted § 254 under step-two of the *Chevron* analysis, and has provided sufficient justification for its change in price cap policy.

The Petitioners point to two statutory provisions that allegedly preclude the FCC from increasing the SLC cap. Section 254(b)(1) states that "[q]uality services should be available at just, reasonable, and affordable rates," and § 254(i) declares that "[t]he Commission and the States should ensure that universal service is available at rates that are just, reasonable and affordable." 47 U.S.C. § 254(i), 254(b)(1). The FCC acknowledges the importance of affordability under the 1996 Act, but

-8-

states that it is only an aspirational guideline that must be carefully balanced with other statutory objectives. In response, the Petitioners imply that the FCC must make affordability paramount in formulating access charge policy, even if it comes at the expense of other statutory goals.

We hold that the FCC's interpretation § § 254(b)(1) and 254(i) as merely aspirational is permissible under step-two of the *Chevron* analysis. Accordingly, the two provisions cannot serve as a basis to invalidate the SLC price cap increase (assuming that the increase endangers affordability, which the FCC denies).

We first discuss § 254(b)(1). Under the heading of "[u]niversal service principles," § 254(b) lists seven factors that the FCC should follow in implementing the 1996 Act.[3] One of the principles is that "[q]uality service should be at . . . affordable rates." 47 U.S.C. § 254(b)(1). We have previously analyzed § 254(b) under *Chevron* step-two because the listed principles use "vague, general language," rendering the section ambiguous. *TOPUC I*, 183 F.3d at 421 (analyzing § 254(b)(3)). Under this deferential review, we have approved the FCC's interpretation of the statutory principles as aspirational only. *See id*, 183 F.3d at 421 (refusing to "rely[] on the aspirational language in § 254(b) to bind the FCC to adopt certain cost methodologies for calculating universal service support"); *see also Chevron* at 843, 104 S.Ct. at 2778 (holding that courts must defer to an agency's reasonable reading of an ambiguous provision). Indeed, the lofty and expansive language of § 254(b) "hardly constitute[] a series of specific statutory commands." *TOPUC I*, 183 F.3d at 421. Rather, they "reflect congressional intent to delegate difficult policy choices to the

---

[3]    The headings of the seven principles are: "Quality and rates"; "Access to advanced services"; "Access in rural and high cost areas"; "Equitable and nondiscriminatory contributions"; "Specific and predictable support mechanisms"; "Access to advanced telecommunications services for schools, health care, and libraries"; and a catch-call "Additional principles." 47 U.S.C. § 254(b)(1)-(7).

Commission's discretion." *See Alenco*, 201 F.3d 608, 615 (5th Cir. 2000); *cf. Nat'l Ass'n of Regulatory Util. Comm'r v. FCC*, 737 F.2d 1095, 1134 (D.C. Cir. 1984) (noting the "breadth of the Commission's statutory discretion to balance the multiple goals embodied in the Communications Act.").

Similarly, we hold that the FCC's reading of § 254(i) as aspirational is a "permissible construction of the statute." *Chevron* at 843, 104 S.Ct. at 2778. Section 254(i) states that the FCC "*should* ensure that universal service is . . . affordable." Generally, courts have "read 'shall' as a more direct statutory command than words such as 'should' or 'may.'" *TOPUC I*, 184 F.3d at 418. The Petitioners counter that courts nevertheless sometimes read "should" as a direct statutory command. *See, e.g., Alenco*, 201 F.3d at 614-15. While that may be true, the Petitioners do not provide any convincing reasons why the word "should" in this context must be read to rebut the general presumption. The Petitioners' argument shows only that, at best, the meaning of § 254(i) is unclear. If a statutory provision is ambiguous, we must uphold the FCC's interpretation as long as it is a reasonable reading. *See Chevron* at 843, 104 S.Ct. at 2778.

Thus, while the FCC cannot flatly ignore or contravene the goal of affordability, Congress gave it the latitude to formulate a policy that considers affordability, along with other policy goals of the 1996 Act. We cannot arrogate to ourselves this policy-making function, merely because we (or the Petitioners) believe that the FCC is not maximizing the affordability goal at the expense of other objectives. As we explain later, the increase in the SLC cap represents FCC's reasoned attempt to maintain the difficult balance between the principles of ensuring affordability and encouraging competition.

Notwithstanding the statutory provisions, we cannot uphold FCC's decision to increase the

SLC caps if it represents an unexplained reversal of past FCC policy. "While the agency is entitled to change its views on the acceptability of [a prior policy], it is obligated to explain its reasons for doing so." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 56, 103 S.Ct. 2856, 2873, 77 L.Ed.2d. 443 (1983). The Petitioners allege that FCC has reversed itself from its earlier decisions not to raise the SLC cap on residences and single-line businesses due to affordability concerns. *See, e.g.,* Access Charge Reform Order, ¶ 73 (increasing the SLC cap only on multi-line businesses).

The FCC has articulated rational reasons to the degree that it has changed prior policies. [4] Simply put, the telecommunications market has undergone dramatic changes in the past few years, and it continues to do so. In light of this dynamic market, the FCC has walked a delicate tightrope between the 1996 Act's twin goals of ensuring affordability and promoting local service competition. We have implicitly recognized that an uneasy tension exists between these two goals: although increased competition will ultimately make phone service more affordable, the transition from a highly-regulated industry to a market-oriented regime can bring some growing pains. *See Alenco*, 201 F.3d at 615. As a consequence, while the "FCC must see to it that *both* universal service and local competition are realized," we have also recognized that "Congress has conferred broad

---

[4] As an initial point, the Petitioners err in intimating that the FCC refused to increase the SLC cap on residential and single-line business customers solely because of affordability. The FCC did not increase the SLC cap for several reasons, including the prudential rationale of not altering the rate structure at a time of rapid reform. For example, in the Access Charge Reform Order, the FCC explained: "Because of concerns about affordability, *and* in light of the significant changes that are still underway in this proceeding, in the federal universal service support proceeding, *and* possible future changes to the separations process, we conclude that the SLC for [residential and single-line business] lines should not be raised." *Id.* (emphasis added). Likewise, the FCC explained in its Universal Service Order that it would not raise "at this time" the SLC caps "in light of significant changes that are still underway." Universal Service Report, ¶ 763.

discretion on the agency to negotiate these dual mandates [and that] courts ought not [to] lightly interfere with its reasoned attempt to achieve both objectives." *Id.* at 615 (emphasis in original).

Citing several factors and changes in the market, the FCC believed that its prior concerns about affordability were "sufficiently mitigated to allow an increase in the SLC" from $3.50 to $6.50 over the course of several years. CALLS Order, ¶ 86. First, the FCC noted that the prior SLC limit of $3.50 was established in 1984; if adjusted for inflation, it would stand at $4.94. *See id.* at ¶ 85. In light of this, the FCC did not find that an increase in the SLC cap would raise affordability concerns. Second, it cited empirical evidence suggesting that telephone subscribership would not be "negatively impacted" by such an increase. *See id.* at ¶ 86. The FCC also noted that increased funding for the Lifeline support program allayed prior fears of unaffordability. Finally, the FCC promised to conduct a cost-study before the SLC is scheduled to rise above $5.00.

In addition, the FCC believed that pro-competitive benefits from the abolition of the PICC would offset any increase in the SLC. Although the PICC is technically assessed against the IXCs, they usually pass it down, with added costs, to the end-users. *See id.* Eliminating the PICC would remove such unnecessary transaction costs. The FCC further reasoned that consumers would benefit because the PICC, as an external cost imposed on all IXCs, is relatively resistant to competitive pressures. *See* CALLS Order, ¶ 89. Consequently, the FCC believed that it would be difficult for the IXCs to reduce and compete away this fee. *See id.* On the other hand, only the ILECs assess the SLC, which is imposed directly against the consumers. The newly entering LECs are not required to charge the SLC. Thus, the FCC held that competitive pressure could force ILECs to reduce the SLC through efficiency gains. *See id.*

The Petitioners strongly dispute the FCC's reasoning. For example, they reply that the FCC's

logic about the PICC is counterintuitive because the long-distance market is currently more competitive than the local service market. Under our standard of review, we are not required to concur wholeheartedly with the policy analysis of the FCC. Rather, we only examine whether "prior policies and standards are being deliberately changed" and "not casually ignored." *Bush-Quayle '92 Primary Campaign Comm., Inc. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997). After reviewing the record, we are satisfied that the FCC has sufficiently explained its reasons for increasing the SLC for residential and single-line business customers. The Petitioners may not agree with the FCC's reasoning, but we cannot usurp the FCC's role in making the difficult policy decisions regarding affordability and competition. *See Alenco*, 201 F.3d at 615.

**B**

The Petitioners also challenge the CALLS Order on the ground that it recovers an unreasonably disproportionate amount of joint and common costs of universal service from end-users. At dispute is the meaning of § 254(k), which states that the FCC "shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide these services." 47 U.S.C. § 254(k). By abolishing the PICC fee assessed against IXCs and increasing the SLC cap on end-users, the FCC unreasonably recovers 100 percent of joint and common costs of universal service from end-users, according to the Petitioners.

One of the Petitioners, TOPUC, had presented this very same argument in challenging the Access Charge Reform Order, which had increased the SLC price cap on multi-line businesses. The Eighth Circuit wholly rejected that argument in *Southwestern Bell*. It noted that "[b]ecause the SLC is a method of recovering loop costs, not an allocation of those costs between supported and

-13-

unsupported services, § 254(k) is not implicated." *Southwestern Bell*, 153 F.3d at 559. We agree with the Eighth Circuit. Section 254(k) concerns cost allocation of joint and common costs, while the SLC and the PICC involve the recovery of such costs. Thus, § 254(k) does not implicate the SLC or the PICC: cost recovery involves how and from whom the funds are collected, while cost allocation refers to how the costs are disbursed.[5]

## C

In enacting the 1996 Act, Congress established the goal that network access charges should eventually reflect the actual costs of providing and administering the particular network service. To meet this objective, the FCC has primarily relied on market forces to restructure the access charges. The Petitioners maintain that the FCC has failed to conduct a comprehensive, forward-looking cost-study in violation of the 1996 Act. We reject this argument.

The 1996 Act does not compel the FCC to conduct forward-looking cost-studies because the cost-study requirements of § § 251(c)(1) and 252(d)(1) do not apply to the interstate access services at issue in this petition. *See Competitive Telecomm. Ass'n v. FCC*, 117 F.3d 1068, 1072 (8th Cir. 1997) ("[I]t is clear from the Act that Congress did not intend all access charges to move to cost-based pricing, at least not immediately. The Act plainly preserves certain rate regimes already in place."). Instead, § § 201(b) and 202(a)'s broader standard that interstate service rates be "just and

---

[5]     In any case, as a practical matter, the Petitioners' fears of anti-consumer effects are exaggerated. Both sides apparently agree that most customers have a presubscribed long-distance carrier, and that IXCs pass down the PICC charge, along with transaction costs, to their customers. Moreover, even "[i]f an end-user customer does not have a presubscribed interexchange carrier," he may not be able to avoid the PICC because "the local exchange carrier may collect the PICC directly from the end user." 47 C.F.R. § 69.153 (2000). Hence, from a policy perspective, end-users will be assessed access charges, whether directly through the SLC or indirectly through the PICC or through a combination of both; thus, a more appropriate question, at least in terms of impact on consumers, is whether the net burden on consumers will be lower or higher.

reasonable" without "unreasonable discrimination" applies here. *See* 47 U.S.C. § § 201(b), 202(a). This "just and reasonable" standard gives the FCC discretion in structuring the access charges. The FCC accordingly has delayed conducting a forward-looking cost-study because of time constraints and the technical uncertainty involved in carrying out a reliable cost study. In lieu of cost-studies, the FCC has primarily relied on competitive pressures to lower costs.

The Eighth Circuit earlier upheld the FCC's reliance on the market to restructure rates. *See Southwestern Bell*, 153 F.2d at 547 (noting that "[d]ue to the difficulty in creating a reliable forward-looking cost model for interstate access services, a prescriptive plan would not be feasible at the present time"). The Petitioners remind the court that nearly three years have passed since the Eighth Circuit's decision. Although we recognize that the FCC has not acted as quickly as the Petitioners would want, we cannot say that the FCC has acted arbitrarily or capriciously, given the transitional nature of the CALLS Order. *See Alenco*, 201 F.3d at 616 (giving special deference to transitional rules). We are further assured by the FCC's promise to conduct a cost-study before the SLC cap is set to rise over five dollars. In sum, we believe that the Eighth Circuit's analysis in *Southwestern Bell* is apropos here:

> The FCC has reasonably exercised its predictive judgment in concluding that competition in the local telephone services market will effectively drive interstate access charges to economic costs. If, in light of the actual market developments, the Commission determines that competition is not having the anticipated effect on access charges, the agency presumably will revisit the issue. We cannot conclude at this time that the FCC's decision to adopt a market-based approach was arbitrary . . . in light of the broad discretion Congress has given the Commission in setting interstate rates.

*Southwestern Bell*, 153 F.3d at 547.

### III

The Petitioners allege that the FCC's procedures in formulating the CALLS Order were fatally

defective and in violation of the APA. *See* 5 U.S.C. § 706(2)(a). They claim that the FCC failed to follow appropriate notice-and-comment procedures; that it acted arbitrarily and capriciously in establishing the $650 million figure for the Universal Service Fund, and that it provided no rational basis to support a 6.5 percent X-Factor.

In reviewing an agency's procedures under the APA, we apply the arbitrary and capricious standard, recognizing that particular deference is accorded to transitional rules. *See Alenco*, 201 F.3d at 616. We cannot "substitute [our] judgment for that of the agency." *State Farm* at 43, 103 S.Ct. at 2866. Our role is "to review the agency action to determine whether the decision 'was based on a consideration of the relevant factors and whether there was a clear error of judgment.'" *State of Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988) (quoting *State Farm*).

## A

The Petitioners characterize the CALLS Order as a tainted political compromise between the FCC and the CALLS Coalition. Specifically, the abbreviated second round of notice-and-comment and the *ex parte* contact between the FCC and the CALLS Coalition suggest that the FCC had given approval to the proposed order before considering public comment, according to the Petitioners. We hold that the CALLS Order is the product of a valid, if not perfect, informal notice-and-comment rulemaking proceeding. The APA requires federal agencies that conduct informal rulemaking to give notice of a proposed rule and consider public comment on it. *See* 5 U.S.C. § 553. This process allows "interested persons an opportunity to participate" in the rulemaking process through the submission of written comments. *See* 5 U.S.C. § 553(c). An agency's failure to comply with the APA requirements "leads in the direction of arbitrary decision-making." *United States v. Nova Scotia Food Prod. Corp.*, 568 F.2d 240, 250 (2d Cir. 1976).

Before it promulgated the final CALLS Order, the FCC held a round of notice-and-comment proceedings for each of its two drafts of the proposed order. The FCC released the original CALLS proposal for public comment on September 15, 1999. Over the course of the next few months, the FCC solicited and received written submissions from dozens of interested parties. In all, the FCC received comments from 36 parties, and reply comments from 29 parties. The Petitioners apparently do not dispute that this first round of notice-and-comment met the APA requirements.

After receiving and considering these comments, the FCC revised the proposed order and released a modified CALLS proposal which took into account concerns about the affordability of the increase in the SLC price cap. The FCC held an abbreviated notice-and-comment period for the revised draft of the proposed order, and issued the final CALLS Order about two months later. The Petitioners complain that this shortened second round of notice-and-comment violated the APA. Furthermore, they point to several *ex parte* contacts between the FCC and the CALLS Coalition. According to the Petitioners, the abbreviated schedule for the revised draft of the proposed order, along with the *ex parte* communication, suggests that the FCC gave "at least tacit approval [of the revised proposed order] . . . lo ng before initiation of the second comment period." In short, they accuse the FCC of flouting the procedural safeguards that ensure meaningful participation by the public in the rulemaking process.

We find the Petitioners' objections without merit. Even if we assume that the abbreviated second round of notice-and-comment did not fully meet the APA requirements, it would not undermine the validity of the CALLS Order because the FCC was not legally required to offer an additional period of notice-and-comment. We have held that "[i]f, after notice and comment, the agency alters the proposed rule, a new comment period will not be required so long as the modified

rule is a 'logical outgrowth of the published proceedings.'" *United Steelworkers of Amer., AFL-CIO-CLC v. Schuykill Metals Corp.*, 828 F.2d 314, 317-18 (5th Cir. 1987).

The revised version of the proposed order was a "logical outgrowth" of the original proposal, which the Petitioners concede met the APA requirements. The modified proposal retained the essential framework of the original proposal, but it added a few provisions to allay affordability concerns (e.g., requiring a cost-study before increasing the SLC cap over five dollars). In other words, had the FCC not even held a second notice-and-comment period, the Petitioners would have no grounds for complaint. We believe that the FCC's second notice-and-comment period, even if it was abbreviated, went above and beyond what the APA legally requires.

Moreover, while interested parties should be able to participate meaningfully in the rulemaking process, the public "need not have an opportunity to comment on every bit of information influencing an agency's decision." *See State of Tex. v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989) (allowing an agency to withdraw regulations and announce modified ones without taking additional comments). Accordingly, the petitioners must show how they were prejudiced by the FCC's failure to solicit additional comments, and how they would have responded had they been given the opportunity to submit additional responses.[6] *See id.* at 799. The Petitioners fail to meet this burden.

We also reject the Petitioners' speculative and perhaps sinister scenario imputed to the *ex parte* communication between the FCC and the interested parties. The APA permits *ex parte* contact between an agency and private parties as long as the agency adequately gives notice of such contact.

---

[6] Similarly, the Petitioners' complaint that they did not have an opportunity to comment on the late-filed Industry Analysis Division study lacks merit. They do not explain how they would have responded to the IAD study, and how the lack of opportunity to comment prejudiced them. *See Lyng*, 868 F.2d at 799. They also do not respond to the FCC's assertion that the study relied on publicly available data.

-18-

*See* 47 C.F.R. § 1.1206(a) (stating that "*ex parte* presentations . . . to or from Commission decision-making personnel are permissible . . . provided that [they] . . . are disclosed"). The Petitioners initially charged the FCC of failing to file such notices, but later retracted that accusation. The record reflects that the FCC properly disclosed the *ex parte* contacts.

Generally, *ex parte* contact is not shunned in the administrative agency arena as it is in the judicial context. In fact, agency action often demands it. As the D.C. Circuit explained, "Under our system of government, the very legitimacy of general policymaking performed by unelected administrators depends in no small part upon the openness, accessibility and amenability of these officials to the needs and ideas of the public from whom their ultimate authority derives, and upon whom their commands must fall." *Sierra Club v. Costle*, 657 F.2d 298, 400-401 (D.C. Cir. 1981).

Finally, we do not agree with the Petitioners that the FCC's private contact with interested parties triggered the procedural mandates of the Negotiated Rulemaking Act of 1990 ("NRA"). *See* 5 U.S.C. § 561. The plain language of the statute undermines the notion that the NRA's procedures are mandatory. The preface of the statute states that, "Nothing in this subchapter should be construed as an attempt to limit innovation and experimentation with the negotiated rulemaking process or with other innovative rulemaking procedures otherwise authorized by law." 5 U.S.C. § 561. The substantive provisions of the statute further reinforce the permissive nature of the NRA. *See, e.g.,* 5 U.S.C. § 563(a) ("An agency *may* establish a negotiated rulemaking committee . . .") (emphasis added); 5 U.S.C. § 563(b) ("An agency *may* use the services of a convener . . .") (emphasis added). The Petitioners fail to cite (and we do not find) any cases contravening the plain language interpretation of the statute.

**B**

We hold that the FCC acted arbitrarily and capriciously in establishing the $650 million amount for the Universal Service Fund. As a part of its goal to replace the implicit subsidy system of rate-manipulation, the FCC promulgated the Universal Service Fund, a five-year transitional plan designed to provide explicit subsidies to poor and rural end-users. In trying to determine the appropriate amount for the Universal Service Fund, the FCC considered six studies, whose estimates ranged from $250 million to $3.9 billion. The Petitioners accuse the FCC of arbitrarily averaging the estimates of the six cost-studies without exercising any independent judgment of its own. *See Laclede Gas Co. v. FERC*, 997 F.2d 936, 947 (D.C. Cir. 1993) (holding that FERC failed to exercise independent judgment in approving a settlement amount merely because it fell within the range of amounts in the record).

Although we do not agree with the Petitioners' contention that the FCC merely averaged the estimates, we find that the FCC failed to exercise sufficiently independent judgment in establishing the $650 million amount. *See id.* The FCC does not explain how it actually derived that figure, and instead seems to invoke the Goldilocks approach to rulemaking: noting that "[s]ome commentators argue that the size of the interstate access universal service mechanism is too large [while] [o]ther commentators argue that the size . . . is too small," the FCC apparently believes that its approach is just right because it falls reasonably within the range of estimates. CALLS Order, ¶ 204. The FCC also relies heavily on the fact that both the IXCs and LECs, which traditionally have had opposing interests, agree on the amount. *See id.* at ¶ 202 ("Because of the divergent interests of these parties, we believe that the $650 million represents a sufficient amount . . ."). An agency abdicates its role as a rational decision-maker if it does not exercise its own judgment, and instead cedes near-total deference to private parties' estimates—even if the parties agree unanimously as to the estimated

amount. *Cf. Laclede*, 997 F.2d at 946 ("Even when the customer support is unanimous, however, FERC retains the responsibility of making an 'independent judgment' as to whether the settlement amount constitutes a reasonable remedy.").

We recognize that identifying a specific amount is an "imprecise exercise," and that our review of the Universal Service Fund is especially deferential due to its transitional nature. *See id.* at ¶ 201. However, the FCC must provide some explanation as to why it found one study more persuasive than the other, even if it does not determine a precise amount as the only "correct" figure. The CALLS Order hints at some reasoned analysis, suggesting that the AT&T study applied the FCC's synthesis model, while the ALTS and Time Warner studies made unwarranted assumptions. *See* CALLS Order at ¶¶ 202, 204. But the CALLS Order fails to address other studies. *See Natural Res. Def. Council v. EPA*, 859 F.2d 156, 194 (D.C. Cir. 1988) (requiring some independent analysis by the agency prior to adoption of a rule).

We remand to the FCC for further analysis and explanation in regards to the $650 million Universal Service Fund.[7]

## C

We also remand the X-Factor issue, finding that the FCC lacked a rational basis in the record to support the 6.5 percent figure. Prior to the CALLS Order, the FCC had designated the X-Factor

---

[7]     We find little merit as to the Petitioners' two other arguments regarding the Universal Service Fund. First, the FCC's failure to consider the TOPUC's cost-study is not a ground for remand. An agency need not respond to every study, and only has to address "significant comments." *See United States Satellite Broad. Co., Inc. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984). Second, we reject the Petitioners' argument that the FCC improperly failed to consult with and receive certification from the Federal-State Joint Board. The statute requires consultation with the Joint Board for only the initial implementation of § 254's universal service requirement. *See* 47 U.S.C. § 254(a)(1). Any consultation afterwards is permissive. *See* 47 U.S.C. § 254(c)(2) ("The Joint Board *may*, from time to time, recommend to the Commission modifications . . .") (emphasis added).

as a proxy for the increase in the LECs' productivity minus the rate of inflation. The price caps for local services were reduced each year by the percentage represented by the X-Factor. The X-Factor thus had the effect of passing down to consumers the savings from increased productivity. In 1997, the FCC set the X-Factor at 6.5 percent. On a petition for review, the D.C. Circuit reversed and remanded the X-Factor issue, holding that there was no rational relationship between the 6.5 percent figure and the alleged increase in productivity. *See USTA*, 188 F.3d at 525.

In its CALLS Order, the FCC reintroduced the same 6.5 percent X-Factor, but stated that the revamped X-Factor serves a different function as a "transitional mechanism that operates to reduce rates at a certain pace, and [is no longer] . . . linked to a specific measure of productivity." CALLS Order, ¶ 140. Therefore, the FCC argues that the CALLS Order does not conflict with the D.C. Circuit's remand order in *USTA*, because the court had only required further justification of the 6.5% figure in light of its role as a productivity proxy. Now that the X-Factor no longer is tied to productivity, the FCC claims that the 6.5 percent figure is acceptable. We disagree.

The new X-Factor suffers from the same infirmity as the prior one: the FCC has failed to show a rational basis as to how it derived the 6.5 percent figure.[8] *See State Farm* at 56, 103 S.Ct. at 2873. Even if the X-Factor is no longer tethered to any productivity measure, the FCC still needs to provide

_____

[8]    We reject the FCC's claim that the Petitioners lack standing to raise the X-Factor issue. An organization has standing to bring a suit if its members suffer an actual or threatened injury. *See Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789 (5th Cir. 2000). As groups representing consumers, the Petitioners allege, among other things, that a non-productivity-based X-Factor will harm consumers because it will no longer pass down the efficiency savings to consumers, and indeed will eventually only offset inflation. The FCC counters that there is no nexus between the new X-Factor and the supposed harm to consumers caused by the 6.5% figure, because the D.C. Circuit had earlier rejected the consumer organizations' argument that the 6.5% figure was too high. The alleged harm here is not the 6.5% figure *per se*, but rather the revamped X-Factor's failure to pass down efficiency savings to consumers.

a rational explanation of how it derived the precise percentage. Otherwise, the FCC would have free reign to set the X-Factor arbitrarily and capriciously. It must justify why a 6.5 percent X-Factor is a more appropriate rate reduction measure, than, say, a .065 percent or 65 percent X-factor.

**IV**

We uphold most parts of the CALLS Order, but remand to the FCC for further analysis and explanation of two portions of the CALLS Order: the $650 million Universal Service Fund and the 6.5% X-Factor.

The petition for review is DENIED IN PART and GRANTED IN PART. The CALLS Order is AFFIRMED IN PART, REVERSED IN PART, and REMANDED IN PART, in accordance with this opinion.