319 F.3d 74
 HUNTINGTON HOSPITAL, Long Island College Hospital, Nassau County Medical Center, New York Methodist Hospital, Northern Westchester Hospital Center, Phelps Memorial Hospital Center, St. Vincent's Hospital, Sound Shore Medical Center, f/k/a New Rochelle Hospital, Southampton Hospital, Staten Island Hospital, f/k/a Richmond Memorial Hospital, Plaintiffs-Appellants,
v.
Tommy THOMPSON, in his official capacity as Secretary of the United States Department of Health and Human Services, and Empire Blue Cross and Blue Shield, Defendants-Appellees.
 No. 01-6095(L).
 No. 01-6097(CON).
 United States Court of Appeals, Second Circuit.
 Argued: February 20, 2002.
 Decided: October 9, 2002.
 Amended: January 13, 2003.
 
 1
 Roy W. Breitenbach (Garfunkel Wild & Travis, Great Neck, NY) for Plaintiffs-Appellants.
 
 
 2
 Paul Kaufman, Assistant United States Attorney, (Alan Vinegrad, United States Attorney for the Eastern District of New York; Deborah B. Zwany and Kathleen A. Mahoney, Assistant United States Attorneys, of counsel) for Defendants-Appellees.
 
 
 3
 Before: VAN GRAAFEILAND and KATZMANN, Circuit Judges, and KORMAN, District Judge.*
 
 
 4
 KORMAN, District Judge.
 
 
 5
 This appeal involves the application of an established principle of administrative law to an exceedingly complex legislative and administrative scheme for Medicare reimbursement of hospitals. Because the principle is easier to explain than the scheme, and because it will be helpful in following our explanation of the scheme, we begin first with a simple statement of the manner in which the principle applies in this case.
 
 
 6
 The law is clear that an administrative agency that promulgates inconsistent regulations interpreting an act of Congress "must supply a reasoned analysis." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting Greater Boston Television Corp. v. F.C.C., 444 F.2d 841, 852 (D.C. Cir.1970)). The Secretary of Health and Human Services ignored this rule here. More than that, this is not simply a case in which an administrative agency changed a regulation that it had previously adopted. Instead, it involves two separate regulations construing the same act of Congress in a totally inconsistent manner. Such administrative rulemaking cannot stand. As Judge Sentelle aptly observed: "The treatment of cases A and B, where the two cases are functionally indistinguishable, must be consistent. That is the very meaning of the arbitrary and capricious standard." Independent Petroleum Ass'n of America v. Babbitt, 92 F.3d 1248, 1260 (D.C.Cir.1996).
 
 Background
 
 7
 Medicare, the federally funded health insurance program for the elderly and disabled, is governed by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 to 1395ggg. See 42 U.S.C. §§ 1395c, 1395d, 1395j, 1395k (2000). This case concerns reimbursement under Part A of the Medicare program, which provides elderly and disabled persons with "basic protection against the costs of hospital, related post-hospital, home health services, and hospice care." 42 U.S.C. § 1395c.
 
 
 8
 Plaintiffs are New York hospitals that accepted assignment of payments from Medicare beneficiaries for in-patient hospital services. Because they were participants in a Medicare demonstration project, for which New York State received approval, they were exempted from Medicare reimbursement rules from January 1, 1983 until December 31, 1985. During this period, Congress made two significant changes in Medicare reimbursement rules, which up until then provided reimbursement through a retrospective reasonable cost system. Under that prevailing reasonable cost system, hospitals reported the total costs for which they sought reimbursement at the end of each year. They were entitled to be reimbursed for those costs that the Secretary determined were reasonable and necessary. 42 U.S.C. § 1395 f(b)(1) (1988). Congress concluded that this scheme did not provide hospitals with sufficient incentive to be efficient. See generally Rye Psychiatric Hosp. Ctr., Inc. v. Shalala, 52 F.3d 1163, 1166 (2d Cir.1995).
 
 
 9
 The first of the two changes relevant here was enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 and is commonly referred to as the TEFRA reimbursement scheme. Under this scheme, a base year would be selected from which the cost of providing hospital services would be calculated. Each subsequent year, the base would be adjusted by multiplying the figure for the base year by legislatively determined percentages that are intended to reflect primarily cost increases attributable to inflation. Rye Psychiatric, 52 F.3d at 1166 & n. 3.
 
 
 10
 In 1983, only one year later, Congress replaced the TEFRA scheme with a Prospective Payment System ("PPS"). The PPS marked a major departure in Medicare reimbursement policy. It established a number of Diagnostically Related Groups ("DRGs"), which describe particular classes of patients and treatments, and the amount Medicare will pay for each. DRG cost schedules are generated from anticipated national and regional average costs for the treatment of particular illnesses. 42 U.S.C. § 1395ww(d)(2)(D) (2000). This system differs substantially from TEFRA. It focuses on national and regional averages for the cost of treating particular illnesses and is not based on the cost to any particular hospital of treating particular DRG-classified illnesses. See Rye Psychiatric, 52 F.3d at 1167. "When a hospital's actual operating costs exceed its federally prescribed limit for the given DRG, the hospital must absorb the difference. Conversely, if a hospital's costs are lower than the federal rates, the hospital retains the difference." Sacred Heart Med. Ctr. v. Sullivan, 958 F.2d 537, 541 (3d Cir.1992).
 
 
 11
 TEFRA remained applicable only to those hospitals and units that were specifically exempted from PPS; it was also applicable to the formula Congress established for the four-year transitional period from TEFRA to PPS. The formula for reimbursement during the transition provided for a portion of the reimbursement to be calculated by using the TEFRA base year and a portion to be calculated by using the PPS scheme. The TEFRA portion decreased proportionally each year until it was phased out completely. See 42 U.S.C. § 1395ww(d)(1)(A)(i)-(ii) (2000).
 
 
 12
 The two categories of cases to which TEFRA continued to apply required the calculation of a base year that was subject to the inflation adjusted multiplier. The significance of an accurate determination of the base year was succinctly summarized by Judge Kaplan as follows:
 
 
 13
 The initial step in fixing a TEFRA hospital's entitlement to reimbursement, generally speaking, is to determine its total "allowable costs" for a base year. 42 C.F.R. § 413.40(b)(1) (1993); Tucson Medical Center [v. Sullivan], 947 F.2d [971] at 975 [(D.C.Cir.1991)]. Reimbursements in subsequent years, however, do not depend on total or allowable costs incurred in those subsequent years. Rather, a maximum permissible reimbursement, or "target amount," for each subsequent period is established by multiplying the figure for the base year by a legislatively determined percentage. 42 U.S.C. § 1395ww(b)(3) (1988); 42 C.F.R. § 413.40 (1993). If a hospital expends more than its target amount, or ceiling, it is reimbursed only up to the amount of the ceiling. If its costs are less than its ceiling, it is given a bonus payment of half the difference between its costs and the ceiling. 42 U.S.C. § 1395ww(b)(1)(A) (1988); 42 C.F.R. § 413.40 (1993); see generally Connecticut Hospital Association v. Weicker, 46 F.3d 211, 214-15 (2d Cir.1995).... How fully a TEFRA hospital is reimbursed from year to year thus depends on (1) how representative its base period is of its actual total costs in the relevant year, and (2) how closely the Congressionally fixed percentage increase mirrors any increase in the hospital's costs. If a hospital's actual total costs equal its costs in the base period plus the statutory increase, it will be fully reimbursed. If a TEFRA hospital's actual total costs in any given year differ from the costs in the base period plus the statutory increase, however, its reimbursement may either fall short of or exceed its actual total costs.
 
 
 14
 Rye Psychiatric, 52 F.3d at 1166 (footnote omitted).
 
 
 15
 The determination of the base year for the TEFRA reimbursement scheme for New York hospitals is at the heart of the dispute here. The parties agree that Congress expressly provided that the same base year used when it adopted the TEFRA scheme, 42 U.S.C. § 1395ww(b)(3)(A), was also to be used to calculate the TEFRA base year component of the reasonable cost calculation for the PPS transition period, 42 U.S.C. § 1395ww(d)(1)(A). The Secretary, however, did not comply with this directive. Instead, the Secretary promulgated two regulations that differed in their definitions of the base year. Specifically, the applicable TEFRA statute, 42 U.S.C. § 1395ww(b)(3)(A)(i), specifies that the base year is the twelve-month cost reporting period preceding that for which the TEFRA scheme is in effect. Since TEFRA took effect in 1983, the base year could reasonably be construed as 1982, as it was for most hospitals in the United States. On the other hand, it would not have been altogether unreasonable to conclude that the first year TEFRA took effect as to the New York hospitals was 1986, because the Medicare reimbursement rules were not applicable to them until 1986. The base year would then have been 1985.
 
 
 16
 In 1986, the regulation defining the TEFRA base year, 42 C.F.R. § 405.463(b)(1) (1982) (renumbered as 42 C.F.R. § 413.40(b)(1), 51 Fed.Reg. 34790, 34790 (September 30, 1986)), was construed in part and amended in part to permit the latter result for those hospitals that were exempt from the PPS scheme. In explaining this action, the Secretary first described the existing regulation and then discussed the changes in interpretation and language that were being made:
 
 
 17
 Section 405.463(b)(1) provides that each hospital's initial rate-of-increase ceiling will be based on allowable inpatient operating costs per case incurred —
 
 
 18
 — In the 12-month cost reporting period immediately preceding the first cost reporting period subject to the [inflation-adjusted] ceiling; or
 
 
 19
 — For short reporting periods (fewer than 12 months), the first 12-month period ending after October 1, 1982.
 
 
 20
 Concern was expressed as to the determination of the base period for hospitals excluded from the prospective payment system in States in which a demonstration project (section 402 of the Social Security Amendments of 1967 or section 222 of the Social Security Amendments of 1972) was terminating. We are revising § 405.463(b)(1), as we had proposed in the NPRM (51 F[ed]. R[eg]. 19990) [(January 3, 1986)], to provide that each hospital's initial base period subject to the rate-of-increase ceiling is —
 
 
 21
 — The 12-month cost reporting period immediately preceding the first cost reporting period subject to the [inflation adjusted] ceiling (for example, the base period would be the cost reporting period beginning on or after January 1, 1985 and before January 1, 1986 for a hospital paid under a demonstration project which terminates December 31, 1985); or
 
 
 22
 — Where the immediately preceding reporting period is a short cost reporting period (that is, less than 12 months), the base period will be the 12-month cost reporting period beginning on or after the date the hospital's exemption from the [inflation-adjusted] ceiling ends (for example, the base period would be the 12-month period beginning on or after January 1, 1986 for a hospital paid under a demonstration project which terminates December 31, 1985, if that hospital's cost reporting period beginning on or after January 1, 1985 and before January 1, 1986 is a short period).
 
 
 23
 51 Fed. Reg. 31454, 31468 (Sept. 3, 1986). The regulation, which was subsequently amended to address issues that are not material here, 53 Fed. Reg. 38476, 38518 (Sept. 30, 1988), presently reads as follows:
 
 
 24
 Each hospital's target amount is based on its allowable net inpatient operating costs per case from the cost reporting period of at least 12 months immediately preceding the first cost reporting period subject to the rate-of-increase ceiling established under this section. If the immediately preceding cost reporting period is a short reporting period (fewer than 12 months), the first period of at least 12 months subsequent to that short period is the base period.
 
 
 25
 42 C.F.R. § 413.40(b)(1) (2001).
 
 
 26
 The Secretary did not at that time or subsequently make a comparable adjustment in the regulations in the second area where TEFRA remained applicable. This was the calculation of the reimbursement during the four-year transitional phase to a full PPS system that commenced on October 1, 1983. Because part of the reimbursement during the transition period was based on the TEFRA scheme, the selection of a base year had to be made for these purposes as well. The relevant regulation defines the base year for the transition period as "the hospital's Medicare Part A allowable inpatient operating costs...for the 12-month or longer cost reporting period ending on or after September 30, 1982 and before September 30, 1983." 42 C.F.R. § 412.71(a) (2001) (originally numbered 42 C.F.R. § 405.474(b)(1)(i) (1983), adopted 48 Fed. Reg. 39752, 39824 (Sept. 1, 1983)). Because hospitals often use dates for their fiscal years that do not correspond to the federal fiscal year, which is October 1 to September 30 of the following year, the regulation provided flexibility to begin the new reimbursement method at the start of each hospital's individual fiscal year rather than in the middle of a cost year. No additional flexibility, however, was shown in the selection of the base year for those New York hospitals that were transitioning into the PPS system. By using a 1982 base year rather than a 1985 base year in calculating the TEFRA part of the transitional reimbursement formula, the Secretary denied the New York hospitals the benefit of the increased actual and allowable costs that they had incurred in 1985. The beneficial relief withheld here was precisely the relief granted in 1986 to those hospitals who were exempted from the PPS system and continued to be reimbursed under the TEFRA system.
 
 
 27
 The adversely affected New York hospitals unsuccessfully challenged the 1982 base year for the PPS transitional period in the administrative proceedings to determine their reimbursement for services rendered from 1996 through 1998. The procedural history is described in the opinion of the district court judge who upheld the validity of 42 C.F.R. 412.71(a). Huntington Hosp. v. Shalala, 130 F. Supp.2d 376, 379 (E.D.N.Y.2001).
 
 Discussion
 
 28
 The parties are in agreement as to the material aspects of the reimbursement schemes. The Secretary concedes that Congress mandated the application of the TEFRA base year when it prescribed the method for calculating the TEFRA portion of the PPS blended transitional reimbursement scheme. Brief of the Secretary at 12-13; 42 U.S.C. § 1395ww(d)(1)(A)(i). The only issue is whether the regulation promulgated to define the TEFRA base year for the PPS transitional period can be sustained as reasonable when it is wholly inconsistent with the definition of the TEFRA base year for hospitals exempted from the PPS payment scheme.
 
 
 29
 In addressing this issue, the district court held that, "[a]lthough less deference should be accorded to administrative interpretations that lack consistency, an agency is not locked into the first interpretation it embraces." Huntington Hosp., 130 F.Supp.2d at 384 (citing Sacred Heart, 958 F.2d at 544). This principle is correct as far as it goes. Nevertheless, it is subject to a significant caveat that the Secretary ignores in defending the inconsistent interpretations. While an agency is not locked into the first interpretation of a statute it embraces, it cannot simply adopt inconsistent positions without presenting "some reasoned analysis." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 57, 103 S.Ct. 2856 (quoting Greater Boston Television, 444 F.2d at 852); see also Rust v. Sullivan, 500 U.S. 173, 187, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); Texas Office of Public Utility Counsel v. F.C.C., 265 F.3d 313, 322 (5th Cir.2001), cert. denied sub nom. National Ass'n of State Utility Consumer Advocates v. F.C.C., 535 U.S. 986, 122 S.Ct. 1537, 152 L.Ed.2d 464 (2002); Skubel v. Fuoroli, 113 F.3d 330, 336 (2d Cir.1997) (holding that "[a]dministrative agencies must articulate a logical basis for their decisions.") (internal citations and quotation marks omitted). The Secretary offered no explanation for the inconsistent interpretation of the same statute reflected in two separate regulations.
 
 
 30
 Sacred Heart, on which the district court relied, does not require that such unexplained rulemaking be sustained as reasonable. While the Court of Appeals did hold that "an agency is not locked into the first interpretation [of a statute] it espouses," it adhered to the caveat that "the agency must offer a reasoned justification for the change in its interpretation of a statute or a modification of its policy." Sacred Heart, 958 F.2d at 544 (internal quotation omitted). In Sacred Heart, the Secretary of Health and Human Services argued that, although the statute may have previously been interpreted improperly, "its current construction is in full accord with the language of the PPS and the legislative intent that motivated its enactment." Id. at 545. The Third Circuit concluded correctly that "this surely constitutes a reasoned justification for the Secretary's departure from its prior interpretation." Id. (internal quotation omitted). This holding does not provide any support for the Secretary here.
 
 
 31
 While the Secretary argues that the PPS regulation is consistent with the language of the PPS, which incorporates the TEFRA base year, the Secretary cannot argue that this regulation is a correction of an earlier erroneous construction. In purely chronological terms, the Secretary's first interpretation of the base year was one which did not take into account the special problem faced by hospitals participating in a Medicare demonstration project. The regulation applicable to hospitals that were exempted from the PPS scheme and the regulation applicable to those hospitals phasing into the PPS system may have been worded differently, but they both utilized 1982 as the base year. See 42 C.F.R. § 405.474(b)(1)(i) (1983); 42 C.F.R. § 405.463(b)(1) (1983). In 1986, the Secretary changed the interpretation of the statute to adopt a base year that was sensitive to the needs of those New York hospitals that continued to be subject to the TEFRA reimbursement scheme. The Secretary, however, did not make a comparable change in the regulation fixing the TEFRA base year for those hospitals transitioning into the PPS system. This is not a case of locking an administrative agency into "the first interpretation it embraces." Rather it is a case in which an administrative agency has engaged in flatly inconsistent rulemaking without any explanation.
 
 
 32
 Moreover, while the selection of 1982 as the TEFRA base year for the transitional period reimbursement calculation may be consistent with the literal language of the statute, it is inconsistent with the expressed intent of Congress that the TEFRA base year for the PPS transition year period be the same as that used for calculating the base year for hospitals covered by TEFRA. We have held that an interpretation is reasonable if it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent." Perry v. Dowling, 95 F.3d 231, 236 (2d Cir.1996) (internal citations and quotations omitted) (emphasis added). The challenged regulation thus fails for the additional reason that it "conflict[s] with Congress' expressed intent" that the base year used for calculating the TEFRA portion of reimbursement during the transition period from TEFRA to PPS be the same base year as that used for calculating reimbursement for hospitals still subject to TEFRA.
 
 Conclusion
 
 33
 The judgment of the district court is reversed with directions to enter a judgment remanding the challenged payment determinations to the Secretary for proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation
 
 
 
 34
 VAN GRAAFEILAND, Senior Circuit Judge, dissenting.
 
 
 35
 While I am as sympathetic to the welfare of the plaintiff hospitals as are my colleagues, I am unwilling to stretch, as they do, to grant relief. Accordingly, I dissent.
 
 
 36
 Judge Spatt's analysis of the issues, reported at 130 F.Supp.2d. 376, is thorough, straightforward and correct, and I would be willing to adopt it as my own. The majority spend much of their opinion addressing the Secretary's actions, but very little of it discussing the merits of the district court's opinion. Indeed, they only criticize Judge Spatt for failing to require "some reasoned analysis" by the Secretary for her asserted lack of consistency.
 
 
 37
 In focusing so myopically on the Secretary's tangential fluctuations, my colleagues overlook the simple fact that 42 C.F.R. § 412.71(a) defines the "base year" in accordance with the plain meaning of 42 U.S.C. § 1395ww(b)(3)(a). As the district court stressed, the statute, which was passed in 1982, specifies "the first such reporting period for which this subsection is in effect," i.e., in the words of the regulation at issue, "the 12-month or longer cost reporting period ending on or after September 30, 1982 and before September 30, 1983." 412.71(a) is an obviously correct interpretation of section (b)(3)(a) in action, and there is no need for a more "reasoned analysis" to uphold it. That the Secretary may have later erroneously interpreted (b)(3)(a) in an inconsistent manner is irrelevant. That questionable subsequent regulation is not at issue.
 
 
 38
 The majority, in the end, essentially direct the Secretary to adopt their interpretation of the statute. Their dictate, with all due respect, seems to me the most arbitrary and capricious part of this case.