Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued November 24, 2003    Decided June 29, 2004

No. 02-1261

NATIONAL ASSOCIATION OF STATE UTILITY
CONSUMER ADVOCATES,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

BELLSOUTH TELECOMMUNICATIONS, INC., ET AL.,
INTERVENORS

————

On Petition for Review of an Order of the
Federal Communications Commission

————

*Billy J. Gregg* argued the cause for petitioner. On the brief was *Michael J. Travieso.*

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Laurence N. Bourne*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *R. Hewitt Pate*, Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *John A. Rogovin*, General Counsel, Federal Communications Commission, and *John E. Ingle*, Deputy Associate General Counsel.

*Michael K. Kellogg* argued the cause for intervenors Bell-South Telecommunications, Inc., et al. With him on the brief were *Aaron M. Panner, Scott H. Angstreich, Gary L. Phillips, Jeffry A. Brueggeman, H. Richard Juhnke, Jay C. Keithley, Michael E. Glover, Edward Shakin, Joseph DiBella*, and *Robert B. McKenna*.

Before: GINSBURG, *Chief Judge*, and EDWARDS and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The National Association of State Utility Consumer Advocates (NASUCA) petitions for review of an order of the Federal Communications Commission adjusting the manner in which Local Exchange Carriers (LECs) may recover the fixed costs they incur in providing service to residential and single-line business customers. NASUCA claims the approach adopted by the Commission violates the "universal service" provisions of the Telecommunications Act of 1996, results in rates that are unjust and unreasonable, and is arbitrary and capricious, in violation of the Administrative Procedure Act. We hold the Commission acted reasonably and in conformity with the 1996 Act and, accordingly, we deny NASUCA's petition for review.

## I. Background

This case challenges the Commission's latest attempt to phase out certain "implicit subsidies" resulting from the access fee the LECs charge interexchange carriers (IXCs) in order to recover the expenses the LECs incur to build and operate local loops — the part of the telecommunications network that runs from the LEC's switch to the customer's

premises (a/k/a "the last mile"). These implicit subsidies are the means by which the Commission assures the provision of universal service, for without the subsidies many customers in sparsely populated areas would be unwilling to pay the high rates necessary to cover the LECs' cost of serving them. As detailed more fully below, and in accordance with the policy of the 1996 Act, the Commission has been attempting to make the subsidies transparent by replacing implicit subsidies with explicit subsidies. *See* 47 U.S.C. § 254. The order here under review is intended to be a step in that direction.

When AT&T was broken up in 1984, the Commission first issued rules governing the access charges IXCs were to pay LECs for originating and terminating long-distance calls. *See generally Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095 (D.C. Cir. 1984). Those charges did not, however, cover the cost of the local loop, which the LECs instead recovered directly from end users through a flat fee per line called the Subscriber Line Charge (SLC); it is flat because the LEC's cost of providing the local loop is not traffic-sensitive. *See In the Matter of Access Charge Reform; Price Cap Performance Review for Local Exchange Carriers; Transport Rate Structure and Pricing End User Common Line Charges* (*Access Charge Reform Order*) ¶ 24, 12 FCC Rcd 15,982, 15,998-99 (1997). Recovering the cost of the loop from end users, however, raised the prospect that customers in outlying regions, where the cost per line could be quite high, would drop their telephone service and thus compromise the objective of universal service. The Commission therefore decreed that some of the cost of the local loop would be recovered through a per-minute-use charge, known as the Carrier Common Line (CCL) charge, that IXCs would pay LECs for handling their traffic. *Access Charge Reform Order* ¶¶ 37, 38, at 15,998-16,000.

The Commission initially capped the SLC at $3.50 per line. Because that was significantly below the average fixed cost of the local loop, a substantial portion of the cost had to be recovered through the CCL charge, which worked a large, albeit implicit, subsidy from high- to low-volume long-distance callers.

The implicit subsidies inherent in the Commission's rate structure helped to assure access to affordable telecommunication service in rural areas, but they were incompatible with another goal of the 1996 Act, namely, opening local telecommunication markets to competition. *Implementation of the Local Competition Provisions of the Telecommunications Act of 1996* ¶ 5, 11 FCC Rcd 15,499, 15,506-07 (1996). To that end the Act required incumbent LECs to share their networks with rival telecommunications providers. *Id.* ¶ 4, at 15,506. A rival telecommunications carrier that leases elements of the incumbent LEC's network has a significant advantage in competing for customers the incumbent must charge above cost in order to subsidize others. *Id.* ¶ 5, at 15,506-07. Indeed, this pattern of subsidization could not persist if incumbent LECs were to compete against new entrants.

In 1997 the Commission took a step toward "[r]ationalizing" its rate structure by "eliminat[ing] significant implicit subsidies in the access charge system." *Access Charge Reform Order* ¶ 36, at 15,998. This it did by allowing greater recovery of fixed costs through flat (as opposed to traffic-sensitive) fees. The Commission did not, however, allow further recovery through the SLC, which remained capped at $3.50 per line, because it was concerned that a higher price for the basic dial tone could cause rural customers to discontinue service — "contrary to [the Commission's] mandate to ensure universal service." *Id.* ¶ 38, at 15,999. Rather than impose an additional charge upon the end user, therefore, the Commission settled upon a "flat, per-line charge assessed on the IXC to whom [sic] the access line is presubscribed," *id.*, known as the presubscribed interexchange carrier charge (PICC).

Not long after introducing the PICC, the Commission realized it was not a complete solution: "Because IXCs have recovered the residential PICCs on a per-account basis, residential customers with only one line pay the same as those with two or more lines, and so pay more than the costs IXCs have incurred for providing them service." *In the Matter of Access Charge Reform; Price Cap Performance Review for Local Exchange Carriers; Low-Volume Long Distance*

*Users; Federal-State Joint Board On Universal Service* (*CALLS I*) ¶ 19, 15 FCC Rcd 12,962, 12,970 (2000). In order to offset that newly-introduced cross-subsidy, the Commission scheduled incremental increases in the cap on the SLC that LECs charge end users — from $3.50 per line to $4.35 in 2000, to $5.00 in 2001, to $6.00 in 2002, and to $6.50 in 2003.* *Id.* ¶ 70, at 12,988-89. Well, not necessarily. Recovery via the SLC was not to exceed the "average . . . common line, marketing[,] and transport interconnection charge revenue" ("CMT Revenue") in any unbundled network element (UNE) zone. *Id.* In other words, the maximum allowable recovery via the SLC, CCL charge, and PICC combined is equal to the amount the LEC would be allowed to recover under price cap regulation, which is based upon the LEC's historical cost of providing the local loop. Accordingly, if the SLC cap exceeds that amount, the LEC may recover up to, but no more than, its CMT Revenue via those three rate elements.

Because a LEC recovers its local loop costs in a "cascading fashion" — first through the SLC, then the PICC, and finally the CCL charge — an increase in the SLC cap reduces by the same amount what the LEC may recover through the CCL charge and the PICC — the Commission's goal being to minimize and then to eliminate those charges. *See In the Matter of Cost Review Proceeding for Residential and Single-Line Business Subscriber Line Charge (SLC) Caps; Access Charge Reform; Price Cap Performance Review for Local Exchange Carriers* (*CALLS II*) ¶ 15, 17 FCC Rcd 10,868, at 10,875-76. When they are eliminated, the LEC is permitted to "deaverage" the SLC in up to four UNE zones, *CALLS I* ¶ 73, at 12,989-90, that is, to calculate the average cost for each zone rather than for all zones combined. Calculating average costs in this manner "enhances the efficiency of the local telephone market by allowing prices to be tailored more easily and more accurately to reflect cost." *Id.* ¶ 113, at 13,007.

———

\* "O what a tangled web we weave, when first we practice to . . ." relieve. With apology to Sir Walter Scott, Marmion, Canto vi, Stanza 17 (1808).

In *CALLS I* the Commission also established the Universal Service Fund, an "explicit interstate universal service support mechanism," in order to help offset the reduction in the implicit subsidies; it is to be funded with $650 million raised through a new element in the rate that LECs charge subscribers. *Id.* ¶¶ 195, 218, at 13,043, 13,057; *see also* 47 U.S.C. §§ 214(e), 254. The Fund was set up as "a five-year transitional plan designed to provide explicit subsidies to poor and rural end-users." *Tex. Office of Pub. Util. Counsel* (*TOPUC*) *v. FCC*, 265 F.3d 313, 327 (5th Cir. 2001).

Finally, in *CALLS I* the Commission undertook to "review any increases to residential and single-line business SLC caps above $5.00 to verify that any such increases are appropriate and reflect higher costs where they are to be applied." ¶ 83, at 12,994. In doing that review, the Commission said it would examine "forward-looking cost information" to be provided by the LECs. *Id.*

The Commission completed its review in September 2001 and issued its findings in June 2002. *See CALLS II*. This is what the Commission found:

> [E]ven the most conservative estimate of forward-looking costs [i.e., NASUCA's] shows that a substantial number of lines exceed both the current $5.00 SLC cap, and the ultimate $6.50 SLC cap. Thus, we determine that raising the SLC cap to the levels set forth in [*CALLS I*] is justified by the record in this proceeding. We also find that those increases to the SLC cap are necessary to achieve our access charge reform goals, as stated in [*CALLS I*], of removing implicit subsidies by moving to a more cost-causative rate structure and enabling greater opportunities for SLC deaveraging.

*Id.* ¶ 5, at 10,871. The Commission also pointed out that it had previously found a SLC cap of $6.50 is "affordable" for residential and single-line business customers, which finding was upheld in *TOPUC*, 265 F.3d at 323. Hence, the Commission concluded, "to achieve the benefits of removing implicit subsidies and allowing SLC deaveraging, while maintaining affordable residential and single-line business rates for con-

sumers," it would allow the SLC cap to increase as scheduled in *CALLS I*. *CALLS II* ¶ 5, at 10,871-72.

NASUCA petitions this court for review of the Commission's decision in *CALLS II*.

## II. Analysis

NASUCA argues the Commission's decision in *CALLS II* violates several provisions of the 1996 Act and is "arbitrary and capricious," in violation of the APA. *See* 5 U.S.C. § 706(2)(A).

### A. 1996 Act Claims

NASUCA first argues the Commission failed to "give effect to the unambiguously expressed intent of Congress," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), to remove implicit subsidies and to replace them with explicit subsidies, as expressed in §§ 254(b)(5) and 254(e) of the 1996 Act. NASUCA supports the factual predicate of this claim by pointing to its own cost study, which showed nearly 75% of residential and single-line business customers have forward-looking costs less than $5.00 and 86% of those lines have forward-looking costs less than $6.50. NASUCA views any SLC charge exceeding forward-looking costs as an "implicit subsid[y] running from customers with lower cost lines to customers with higher cost lines."

The Commission responds that an implicit subsidy from lower cost to higher cost lines was not immediately ruled out by the 1996 Act and under *CALLS I* is only to be phased out over time; in fact, some subsidization is "inevitable" as long as there is any rate averaging. According to the Commission, the issue in this case, properly understood, is whether its approach is "an improvement over the pre-existing situation and will provide a transition to less subsidization." We agree.

Although the Act charges the Commission with devising "specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service," 47 U.S.C. § 254(b)(5), it does not decree an immediate revolution; as we have said before, "there is no time limit on *realization* of

the reform," *Competitive Telecomms. Ass'n v. FCC*, 309 F.3d 8, 15 (D.C. Cir. 2002) (emphasis in the original). The Commission in *CALLS I* put in place a reasonable timetable, *id.*, recognizing that only by proceeding in steps may all implicit subsidies be eliminated without compromising universal service.

In *CALLS II* the Commission explained that an increase in the SLC cap would help LECs eliminate the PICC, ¶¶ 40-42, at 10,886-87, which the Commission had previously found to be an inefficient method of recovering the LECs' fixed costs:

> By eliminating the residential and single-line business PICCs, the CALLS Proposal establishes a straightforward, economically rational pricing structure which enables consumers to make a choice among competing providers through head-to-head comparisons and better promotes competition by sending potential entrants economically correct entry incentives.

*CALLS I* ¶ 78, at 12,991. Again, an increase in the SLC cap does not increase the LEC's revenue; rather, it merely shifts the source of the LEC's CMT Revenue away from the CCL charge and the PICC. *CALLS II* ¶¶ 5, 15, at 10,871-72, 10,875-76. Moreover, eliminating those charges is a precondition to the LEC being able to deaverage rates across UNE zones. Deaveraging was made an important objective in *CALLS I*, ¶¶ 113-28, at 13,007-14, and the method the Commission chose to accomplish that objective — namely, raising the SLC cap based upon the cost studies conducted for *CALLS II*, after having determined that doing so would not jeopardize universal service, *see id.* ¶ 85, at 12,995; *TOPUC*, 265 F.3d at 323 — was eminently reasonable.

NASUCA next argues the increase in the SLC cap allows LECs to charge SLC rates that are not "just and reasonable," in violation of 47 U.S.C. §§ 201(b) and 254(b)(1). It acknowledges that *CALLS II* does not alter the Commission's price-cap regime for setting rates, which has been in place since 1991 and has been upheld by this court. *See Nat'l Rural Telecom Ass'n v. FCC*, 988 F.2d 174 (D.C. Cir. 1993); *Southwestern Bell Tel. Co. v. FCC*, 10 F.3d 892 (D.C. Cir.

1993). Rather, it claims the increases in the SLC cap under *CALLS II* violate the "regulatory framework" of *CALLS I*, under which, according to NASUCA, the Commission must set rates based upon forward-looking costs. The Commission responds by pointing out that in *CALLS II* it changed only the SLC cap; it did nothing to change the method it uses to set the underlying SLC rates. *See CALLS II* ¶ 26, at 10,879.

The Commission is clearly correct. Nothing in *CALLS I* committed the Commission to the sea change in rate-setting urged by NASUCA, that is, immediately basing all LECs' rates solely upon forward-looking costs. On the contrary, the Commission stated in *CALLS I* that it was "extending for five years" its existing approach, which would over time bring rates "toward forward-looking economic cost." ¶ 60, at 12,-984-85. As the Commission reasonably observed in the order under review, the CALLS proceedings were "not designed to change the existing method of setting SLC *rates*, which relies on the application of the price cap formula to CMT revenues." *CALLS II* ¶ 26, at 10,879 (emphasis in original). That approach, as mentioned above, is based upon historical, not forward-looking, cost.

Finally, both in arguing the Commission violated the 1996 Act and in arguing its decision is arbitrary and capricious (see Part II.B, below), NASUCA claims no further increase in the SLC cap was necessary due to the "explicit" support provided by the $650 million Universal Service Fund. That Fund, however, is only one part of the Commission's overall approach to eliminating implicit subsidies. Neither in *CALLS I* nor in *CALLS II* did the Commission indicate the Universal Service Fund alone would be sufficient to achieve the Commission's ultimate goal of eliminating all implicit subsidies. Accordingly, NASUCA's invocation of the Fund does nothing to call into question the reasonableness of the Commission's decision.

B. APA Claims

NASUCA argues the Commission's decision in *CALLS II* is "arbitrary and capricious" because it: (1) "runs counter to the evidence" in the record; (2) "failed to articulate any explana-

tion" for its conclusion; (3) departed from precedent upon the basis of irrelevant factors; and (4) failed to explain why it departed from prior FCC policy. For the most part, NASUCA here simply repackages its claims under the 1996 Act as claims the Commission's decision violates the Administrative Procedure Act. We find the Commission's decision no less reasonable when viewed through the lens of the APA. As we have seen, the agency adequately explained its reason for increasing the SLC cap above $5.00, namely, to help eliminate the CCL charge and the PICC and thereby facilitate deaveraging and more efficient pricing. *Id.* ¶¶ 27, 40-42, at 10,879-80, 10,886-87. All that remains is NASUCA's objection to the factual basis for the Commission's decision.

In claiming the Commission's decision is not supported by evidence in the record, NASUCA belittles the Commission's finding that 33 million residential and small business lines, 30% of all such lines, have forward-looking costs in excess of $5.00. Pointing out that 78 million such lines (or 70%) must have costs at or below $5.00, NASUCA claims the Commission had no valid reason for raising the SLC cap.

The Commission explained, however, that increases in the SLC cap are appropriate if a "substantial number of lines [have] forward looking costs that exceed the current $5.00 SLC cap and the ultimate $6.50 SLC cap." *Id.* ¶ 27, at 10,879. The "most conservative estimate" in the record, which was based upon NASUCA's own study, was that 33 million residential and small business lines had costs above $5.00, and 20 million of those lines had costs above $6.50, *id.* at 10,880; *see also id.*, Attachment A, numbers the Commission deemed "substantial."

NASUCA maintains the Commission's determination that 33 million lines is a "substantial" number is not entitled to deference from the court; this line-drawing exercise, it says, is "quite straightforward," calling upon the agency for neither expertise nor discretion. That is just not correct.

In deciding to raise the SLC cap, the Commission first had to determine how much confidence to place in the various studies of forward-looking costs. *Id.* ¶¶ 30-38, at 10,881-85.

It then had to strike a balance between the "removal of implicit subsidies and ensuring affordability" and hence universal service. *Id.* ¶ 27, at 10,879–80. In so doing, the Commission deemed the number of lines with costs above the SLC caps "substantial" because they were numerous enough that increasing the caps as scheduled would significantly reduce the inefficient, implicit subsidies and in some areas facilitate deaveraging by eliminating the subsidies altogether.

The Commission is necessarily entitled to substantial deference when it must draw numerical lines in order to balance two congressional policies that cannot both be fully achieved. *See Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 162 (D.C. Cir. 2002) (setting minimum number of station owners in market to strike balance between "efficiencies of television duopolies" and "robust level of diversity" is "quintessentially [a] matter[ ] of line drawing invoking the Commission's expertise"); *see also Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998), quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 60 (D.C. Cir. 1977) (court generally "unwilling to review line-drawing performed by the Commission unless a petitioner can demonstrate that lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem").

In sum, NASUCA's claim that the Commission's decision to raise the SLC cap was arbitrary and capricious simply ignores the Commission's reasoning in *CALLS II* and the facts upon which that decision is based. The Commission's decision striking a balance between competing congressional directives — reducing implicit subsidies and maintaining universal service — was reasonable and was supported by substantial evidence in the record.*

---

* NASUCA also claims the Commission violated 47 U.S.C. § 254(k) by permitting recovery of traffic-sensitive loop costs through the SLC, and acted arbitrarily and capriciously by declining to evaluate the SLC caps upon the basis of the alternate "run" of NASUCA's study, which purported to exclude traffic-sensitive costs. We have considered and rejected these claims, which do not warrant treatment in a published opinion.

### III.   Conclusion

For the foregoing reasons, NASUCA's petition for review is

*Denied.*