**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 23 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

QWEST COMMUNICATIONS
INTERNATIONAL INC.,

     Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

     Respondents,

No. 03-9617

---

VERIZON TELEPHONE COMPANIES;
AT&T CORP.; MAINE PUBLIC
UTILITIES COMMISSION; SBC
COMMUNICATIONS, INC. (SBC);
BELLSOUTH CORPORATION;
VERMONT PUBLIC SERVICE
BOARD; MONTANA CONSUMER
COUNSEL; MONTANA PUBLIC
SERVICE COMMISSION; WYOMING
PUBLIC SERVICE COMMISSION,

     Intervenors,

and

NATIONAL ASSOCIATION OF
STATE UTILITY CONSUMER
ADVOCATES,

     Amicus Curiae.

SBC COMMUNICATIONS, INC.,

    Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

    Respondents.

---

NATIONAL ASSOCIATION OF
STATE UTILITY CONSUMER
ADVOCATES,

    Amicus Curiae.

---

VERMONT PUBLIC SERVICE
BOARD,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

    Respondents.

NATIONAL ASSOCIATION OF
STATE UTILITY CONSUMER
ADVOCATES,

    Amicus Curiae.

No. 04-9518

No. 04-9519

2

Jonathan J. Frankel (John H. Harwood II, Heather M. Zachery, and Stephen M. Obenski, with him on the briefs), Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Petitioner Qwest Communications International Inc., and Petitioner and Intervenor SBC Communications Inc.

Elisabeth H. Ross (Peter Bluhm, Vermont Public Service Board, Montpelier, Vermont, with her on the briefs), Birch, Horton, Bittner and Cherot, Washington, D.C., for Petitioner and Intervenor Vermont Public Service Board.

James M. Carr (John A. Rogovin, General Counsel, Austin C. Schlick, Deputy General Counsel, John E. Ingle, Counsel, Laurel R. Bergold, Counsel, and William Scher, Counsel, on the brief) Federal Communications Commission, Washington, D.C., for Respondent Federal Communications Commission.

Mary Wright, Attorney, Montana Consumer Counsel, Helena, Montana, for Intervenor Montana Consumer Counsel and Martin Jacobsen, Special Assistant Attorney General, Montana Public Service Commission, Helena, Montana, filed a brief for Intervenors Montana Consumer Counsel and Montana Public Service Commission.

Patrick J. Crank, Attorney General, Michael L. Hubbard, Deputy Attorney General, and Barbara L. Boyer, Senior Assistant Attorney General, State of Wyoming, Cheyenne, Wyoming filed a brief for Intervenor Wyoming Public Service Commission.

Michael E. Glover, Edward S. Shakin, and Ann H. Rakestraw, Verizon, Arlington, Virginia; Lisa S. Foshee, BellSouth Corporation, Atlanta, Georgia; Richard G. Taranto, Farr & Tarranto, Washington, D.C., filed a brief for Intervenors Verizon Telephone Companies and BellSouth Corporation.

Leonard J. Cali, Lawerence J. Lafaro and Judy Sello, AT&T Corp., Bedminster, New Jersey; David L. Lawson, Virginia A. Seitz and James P. Young, Sidley Austin Brown & Wood LLP, Washington, D.C., filed an Intervenors brief for AT&T Corp.

Simon Lipstein, Assistant Attorney General, Denver, Colorado and Patrick N. Pearlman, Deputy Consumer Advocate, West Virginia Consumer Advocate, Charleston, West Virginia, filed an Amicus Curiae brief of the National Association of State Utility Consumer Advocates.

---

Before **KELLY**, **BALDOCK**, and **BRISCOE**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

These consolidated petitions collectively challenge the Order on Remand of the Federal Communications Commission ("FCC" or "Commission"). In Qwest Corp. v. FCC, 258 F.3d 1191 (2001) ("Qwest I"), we reversed and remanded the FCC's mechanism for providing federal support to non-rural telecommunications carriers under the 1996 Telecommunications Act, 47 U.S.C. § 254 (the "Act") . In the Order on Remand the Commission sought to address the issues we identified in our previous decision. Today, we grant in part and deny in part the petitions for review. We hold that the FCC relied on an erroneous, or incomplete, construction of 47 U.S.C. § 254 in defining statutory terms and crafting the funding mechanism for non-rural, high-cost support. That construction of the statute is fatal to the cost support mechanism at issue in this case. However, we affirm that portion of the Order on Remand creating a mechanism to induce state action to assist in implementing the goals of universal service.

4

In Qwest I, we discussed in detail the advent of the competitive telecommunications market brought about by the passage of the Telecommunications Act of 1996 and the FCC's subsequent regulatory attempts to implement the Act's various mandates. 258 F.3d 1196. To avoid repetition, we only briefly discuss those facts relevant to our discussion here.

Congress sought to introduce competition into once monopolized telecommunications markets through the passage of the Act. H.R. Rep. No. 104-204, at 48 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 11; see also James B. Speta, Deregulating Telecommunications in Internet Time, 61 Wash. & Lee L. Rev. 1063, 1092-93 (2004) (summarizing Congressional intent). In so doing, Congress expressed its continued commitment to preserving universal service. See 47 U.S.C. § 254(b); Jennifer Hargroves, Adjudication of Universal Funding in the Telecommunications Sector, 79 Denv. U. L. Rev. 491, 494-96 (2002). Universal service incorporates the goal of insuring that consumers throughout the nation, in both rural and urban markets, have access to an evolving range of telecommunications services. Qwest I, 258 F.3d at 1195; see also 47 U.S.C. § 254(c)(1) ("Universal service is an evolving level of telecommunications services . . . taking into account advances in telecommunications and information technologies and services.").

Prior to passage of the Act, universal service was largely sustained through explicit, monetary payments to local carriers and a system of implicit subsidies. Qwest I, 258 F.3d at 1196. The cost of providing service in rural areas often greatly exceeds that in urban areas. Id. To ensure universal service, states often permitted carriers to charge higher rates in urban areas to subsidize the cost of providing service in rural areas. Id. Similarly, the federal government structured long-distance rates to subsidize local service. Id. With the advent of competition, Congress feared that carriers entering the market would compete aggressively for low-cost, urban areas, leaving former monopoly carriers the unsustainable burden of providing service to rural areas in the face of a dwindling urban base.

To guide the FCC in implementing "policies for the preservation and advancement of universal service," 47 U.S.C. § 254(b), Congress enunciated various principles, several of which are at issue here. Congress noted that "[q]uality services should be available at just, reasonable, and affordable rates." Id. § 254(b)(1). Consumers in rural and high-cost areas should have access to telecommunications services at "rates that are reasonably comparable to rates charged for similar services in urban areas." Id. § 254(b)(3). Congress further posited that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." Id. § 254(b)(5). Under the Act, telecommunications carriers might qualify for federal

6

support to provide service to consumers in rural and high-cost areas. Id. § 254(e). The Act requires such federal support to "be *explicit* and sufficient to achieve the purposes of [universal service]." Id. (emphasis added).

A.      The Ninth Order and Qwest I

In Qwest I we reversed and remanded the FCC's Ninth Report and Order, FCC 99-306, CC Docket No. 96-45 (Nov. 2, 1999) ("Ninth Order").[1] 258 F.3d at 1205. The Ninth Order finalized the FCC's funding mechanism for non-rural telecommunications carriers in high-cost areas. Rural carriers serve only rural areas or are small in size. Id. at 1196. In contrast, non-rural carriers are larger and serve some urban areas. Id. To achieve rate comparability, the FCC based its support mechanism on forward-looking costs per line. Id. at 1197. The FCC found that costs, as opposed to rates, were a better indicator of comparability. Id. First, the FCC set a benchmark of 135% of the national average cost per line. Id. The FCC then determined carrier eligibility by comparing individual state average costs per line to the federal benchmark. Id. Non-rural carriers in states with average costs exceeding the national benchmark were eligible for support. The FCC further conditioned support on state certification that an eligible non-rural carrier would use the federal funds in compliance with 47 U.S.C. § 254(e) (mandating

---

[1]In Qwest I we affirmed the FCC's Tenth Report and Order, FCC 99-304, CC Docket Nos. 96-45, 97-160 (Nov. 2, 1999), wherein the Commission selected input values for its cost model. 258 F.3d at 1207.

7

that federal funds only be used "for the provision, maintenance, and upgrading of facilities and services for which the support is intended"). Id. at 1198.

We predicated our decision in Qwest I on a finding that the FCC had failed to "provide sufficient reasoning or record evidence to support [the Ninth Order's] reasonableness." Id. at 1195. First, we held that the FCC had failed to adequately define key statutory terms, including "reasonably comparable" and "sufficient." Id. at 1201. In so doing, we expressed concern regarding the alleged variance in rates encompassed by the FCC's national cost benchmark. Id. Second, we held that the FCC had likewise failed to justify the 135% benchmark against the statutory goals of reasonable comparability and sufficiency. Id. at 1202. While rejecting the argument that the use of statewide and national averages is inconsistent with the statutory mandate, Id. n.9, we noted that the FCC had failed to evaluate data in the record comparing rural and urban costs under the proposed funding mechanism and had not provided a cogent explanation for its choice of 135% as the benchmark figure. Id. at 1202. Third, we found that the Ninth Order provided no mechanisms to induce states to implement their own universal service programs; this despite the fact that the FCC itself acknowledged that the support provided by the Ninth Order could not result in reasonably comparable rates absent state action. Id. at 1203-04. Finally, we noted that the FCC had provided insufficient information concerning the full extent of federal universal service support. Id. at 1204-

8

05. Lacking this global context, we could not proceed in assessing the reasonableness of the Commission's actions. Id. at 1205.

In remanding the Ninth Order, we required the FCC to take the following actions. First, we directed the Commission to define relevant statutory terms "more precisely in a way that can be reasonably related to the statutory principles, and then to assess whether its funding mechanism will be sufficient for the principle of making rural and urban rates reasonably comparable." Id. at 1202. Second, we required the FCC to "provide adequate record support and reasoning for whatever level of support it ultimately selects upon remand." Id. at 1203. Third, we held that the FCC was required on remand "to develop mechanisms to induce adequate state action" to assist in implementing the goals of universal service. Id. at 1204. Finally, we requested that the FCC "explain further its complete plan for supporting universal service." Id. at 1205.

B.      The Order on Remand

The FCC responded to our opinion in its Order on Remand, FCC 03-249, CC Docket No. 96-45 (October 27, 2003) ("Order on Remand"). The Commission first sought to address our concerns with respect to the definitions of statutory terms. The FCC defined "sufficient" as "enough federal support to enable states to achieve reasonable comparability of rural and urban rates in high-cost areas served by non-rural carriers." Order on Remand ¶ 4. The Commission then defined "reasonably comparable"

9

in terms of a national urban rate benchmark, i.e., rural rates are deemed reasonably comparable if they fall within two standard deviations[2], or roughly 138%, of the national urban average. Id. ¶ 38 n.130.

The Order on Remand contains the FCC's revised federal support mechanism for non-rural carriers in high-cost areas. To gauge whether current support mechanisms result in reasonably comparable rates, the Order on Remand requires states to regularly compare individual rural rates with the national average urban rate benchmark referenced above. Id. ¶ 70. The states must annually certify to the FCC whether their rural rates are reasonably comparable. Id. The benchmark represents a safe harbor, i.e., rates falling within the benchmark are presumed reasonably comparable. Id. However, states have the option to present additional information that other factors impact the comparability of their rates in high cost areas. Id. ¶ 70, 73. Importantly, non-rural carriers' eligibility for federal support is dependant on effective state certification. Id. ¶ 92. To determine the level of support, the FCC then compares the statewide average cost per line against a national average cost per line. Id. ¶¶ 49-50. Support is only available if the state's average exceeds the national average plus two standard deviations. Id. ¶ 64. Thus, the

_____

[2]A standard deviation is a statistical term representing the difference between input values in a range and the mean or average. One standard deviation encompasses 68.27% of the values in a given range. Two standard deviations encompasses 95.45% of the same values. In a hypothetical survey of 100 varying rates charged by telecommunications carriers, two standard deviations from the mean will encompass nearly 96 of the rates in the range, leaving roughly 4 rates outside the grouping.

Order on Remand actually contains two separate benchmarks: a national average urban rate benchmark is used to determine whether rates are reasonably comparable and a national cost benchmark is used to determine the availability and amount of federal support.

In drafting the Order on Remand, the FCC rejected complaints from states and telecommunications carriers asserting that the previous level and allocation of funding were inadequate for the purposes of insuring universal service. However, as conceded by Petitioners, the Order on Remand increases the level of federal support from $254 million to $278 million, and the number of qualifying states from eight to ten.

C.    Petitions for Review

We have consolidated three petitions for review filed against the Order on Remand. In Nos. 03-9617 and 04-9518, Qwest Communications International, Inc. ("Qwest") and SBC Communications, Inc. ("SBC") argue that (1) the FCC has violated a statutory mandate in failing to ensure that the states transition from implicit to explicit support mechanisms, (2) the Commission's definition of "reasonably comparable" runs counter to both the statute and this court's prior decision, (3) the FCC ignored this court's decision in failing to adopt adequate state inducements to ensure reasonable comparability, and (4) the Commission's definition of "sufficient" is counter to express Congressional intent and this court's opinion in Qwest I. In No. 04-9519, the Vermont

11

Public Service Board ("Vermont") argues that (1) the Commission's definition of "reasonably comparable" does not provide a precise limiting standard, (2) the FCC's cost-based support mechanism is not supported by reasoned analysis and fails to provide sufficient support, and (3) the FCC failed to resolve inequalities in its larger system to ensure that support is sufficient overall. The Wyoming Public Service Commission, Montana Consumer Counsel, and Montana Public Service Commission have intervened in opposition to the Order on Remand. Vermont has intervened in partial support of the Order on Remand. Further, AT&T Corporation, BellSouth Corporation, and Verizon Telephone Companies have also intervened in support of the FCC. Finally, the National Association of State Utility Consumer Advocates ("NASUCA") has filed an amicus curiae brief supporting affirmance of the Order on Remand.

## Discussion

Our jurisdiction to review final FCC orders arises under 28 U.S.C. § 2342(1). The Administrative Procedure Act limits our review, and we will set aside a final agency action only if we find it to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While our review under the arbitrary and capricious standard is necessarily narrow, it is not insubstantial. See Lamb v. Thompson, 265 F.3d 1038, 1046 (10th Cir. 2001). In fact, we are required to "engage in .

12

. . a probing, in-depth review." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 415 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). An agency's action is arbitrary and capricious

> if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

We owe deference to an agency's construction of a statute it is empowered to administer. Mainstream Mktg. Servs., Inc. v. FTC, 358 F.3d 1228, 1250 (10th Cir. 2004). In reviewing the agency's interpretation, we first seek to determine "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842 (1984). If Congress has spoken, our inquiry ceases; the agency, as well as the court, must give effect to Congress's unambiguously expressed intent. Id. at 842-43. However, if the statute is silent or ambiguous, we must ask "whether the agency's answer is based on a permissible construction of the statute." Id. at 843. We must not simply impose our own construction. Id. Deference is especially due when an agency's interpretation of a statute rests upon its considered judgment, a product of its unique expertise. See id. at 844. We will not defer to an agency's construction if it is "'arbitrary, capricious, or manifestly contrary to the statute.'" Center for Legal

13

Advocacy v. Hammons, 323 F.3d 1262, 1267 (10th Cir. 2003) (quoting Pharmanex v. Shalala, 221 F.3d 1151, 1154 (10th Cir. 2000)).

I.      The Full Extent of Federal Support

In Qwest I, we noted our inability to properly assess the sufficiency of federal support for universal service in the absence of a comprehensive description of the support mechanisms envisioned by the FCC. 258 F.3d at 1204. At the time, the FCC had reserved the possibility of utilizing a different funding mechanism for rural carriers and was still engaged in the process of reforming implicit federal support. Id. at 1204-05. Nevertheless, we did not require the FCC to finally resolve all relevant issues in its subsequent order. Id. at 1205.

The FCC's response aptly demonstrates the complexity of current mechanisms employed to support universal service. Federal support to non-rural high-cost carriers currently represents but a small percentage of comprehensive federal high-cost support allocations–only 13.7% of high-cost support allocated in 2002. Order on Remand ¶ 102. In the past several years, the FCC has sought to institute significant changes in its system of support for non-rural carriers, including the mechanisms at issue in the Ninth Order and the Order on Remand. At the same time, the Commission has proceeded far more cautiously with respect to rural carriers. Id. ¶ 99. In 2001, the FCC chose not to tie intrastate high-cost support for rural carriers to a forward-looking cost model, the same

14

model applied to non-rural carriers. Id. ¶ 100. Instead, the Commission adopted a five-year, modified embedded cost mechanism. Id. Prior to the conclusion of this period, the FCC intends to develop a long-term universal service plan that recognizes distinctions between and among rural carriers and non-rural carriers and better targets support to rural carriers in the highest cost areas. Id. The Commission believes that the present system has "proved sufficient to preserve and advance universal service," pointing to high subscribership rates and its conclusion that rural and high-cost rates are reasonably comparable to urban rates under a Government Accounting Office ("GAO") Report.[3] Id. ¶ 105.

We recognize the evolving nature of the system of supports employed by the FCC. While a comprehensive picture of those supports is necessarily obscured at this juncture, the description provided by the Commission in the Order on Remand informs our analysis.

II.    Explicit Subsidies and the States

Qwest and SBC first argue that 47 U.S.C. § 254 requires both the federal government and the states to replace implicit subsidies with explicit subsidies. Furthermore, the Petitioners posit that the FCC has acted unlawfully by failing to ensure that the states transition to an explicit subsidy system. Finally, Qwest and SBC contend

---

[3]The Government Accounting Office is now the Government Accountability Office.

that the FCC has acted arbitrarily and capriciously by ignoring its own calls for a transition to explicit support.

A.      Finality and Ripeness

As a preliminary matter, the FCC argues that its determination that the statute contains no mandate for states to transition from implicit to explicit subsidies is not a final action suitable for appellate review. In the alternative, the Commission contends that the issue is not presently ripe for consideration. We reject both arguments.

In determining whether an agency action is final, we inquire (1) whether the impact of the action is "direct and immediate," (2) "whether the action marks the consummation of an agency's decision-making process," and (3) whether the action settles the rights and obligations of parties, or gives rise to legal consequences. Gordon v. Norton, 322 F.3d 1213, 1220 (10th Cir. 2003). In this case, the FCC has unequivocally stated "that the 1996 Act does not require states to adopt explicit universal service support mechanisms." Order on Remand ¶ 26. The FCC concedes, as it must, that this statement unambiguously evidences its legal determination with respect to the statutory requirement. However, the Commission contends that because it has yet to decide what measures to adopt, *if any*, to induce states to remove implicit subsidies from intrastate rates, the action is not final. Further, the FCC argues that SBC has failed to exhaust remedies because it is currently challenging the statutory determination in an on-going

16

rule-making proceeding.  As a result, the FCC contends that the matter of a statutory

mandate remains before the Commission for consideration.

The FCC's determination that the Act does not mandate state action satisfies our

finality inquiry.  The Commission has repeatedly stated that the Act does not mandate that

states transition from implicit to explicit subsidies.[4]  See id. (citing Seventh Report &

Order and Thirteenth Order on Reconsideration ¶ 45, FCC 99-119, CC Docket Nos. 96-

45, 96-262 (May 28, 1999)).  When the agency has repeatedly stated its interpretive

conclusion, an appearance of finality is indeed established.  HRI, Inc. v. EPA, 198 F.3d

1224, 1236 (10th Cir. 2000) (noting that in marking the consummation of a decision-

making process, the challenged action "must not be of a merely tentative or interlocutory

nature").  The result is direct and immediate because it rejects concerted action on the part

of the FCC to enforce an alleged statutory mandate.  Finally, it is plain that the FCC's

determination settles one aspect of its obligation under the act, giving rise to clear legal

responsibilities.

Turning to ripeness, we consider the following factors when determining whether

---

[4]The Commission's ongoing efforts to determine what, if any, inducements to adopt to effect state transition are simply not germane in this context.  Nor do SBC's comments in a subsequent, unrelated proceeding before the FCC preclude our inquiry.  The FCC's argument sweeps too broadly and would close the door to the appellate process envisioned by 28 U.S.C. 2342(1) any time a petitioner evidenced disagreement with a final agency decision during a subsequent rule-making.  Where, as here, the agency has repeatedly iterated its position and given no indication that it is willing to reconsider its action, exhaustion in a collateral hearing would be futile.

17

an issue is ripe for review under the APA:  (1) whether the issues involved are purely legal, (2) whether the agency's action is final, (3) whether the action has or will have an immediate impact on the petitioner, and (4) whether resolution of the issue will assist the agency in effective enforcement and administration.  Gordon, 322 F.3d at 1219.

The FCC arguably concedes that the issue here is purely legal, Comm'n Br. at 35, n.43, and we agree.  The interpretation of a statute is a purely legal issue.  As noted above, we likewise find that the action involved is final.  Qwest and SBC allege a direct and immediate impact in that they continue to see an erosion of implicit subsidies as competitors seize low-cost, urban market share.  Harm is perpetuated through both the structure of the federal support mechanisms and the Commission's unwillingness to take action to force the states to transition to explicit subsidies.  That the support mechanisms crafted by the FCC would be subject to change under the petitioner's proposed interpretation cannot be doubted.  Qwest and SBC have adequately stated an immediate and ongoing impact in the face of allegedly dwindling implicit support sufficient for our inquiry.  Finally, we believe that judicial resolution will promote effective enforcement and administration.  Our determination of the issue will necessarily clarify the Commission's role, thus facilitating its future efforts to preserve and advance universal service.  The issue is accordingly ripe for review.

B.      Statutory Mandate?

Under 47 U.S.C. § 254(b), the FCC must base its policies for the preservation and advancement of universal service on several enunciated principles. Relevant here, Congress stated that "[t]here should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5). Under a separate provision, Congress noted that federal support "should be *explicit* and sufficient to achieve the purposes of [universal service]." Id. § 254(e) (emphasis added).

As we explained in Qwest I, the Act "plainly contemplates a partnership between the federal and state governments to support universal service." 258 F.3d at 1203. The terms of the Act evidence recognition of concurrent state authority, providing:

> A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. . . . A state may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

47 U.S.C. § 254(f).

From these excerpts, Qwest and SBC[5] deduce a statutory mandate requiring states to transition from implicit to explicit support mechanisms. We reject this argument. In drafting the statute, Congress unambiguously imposed an explicit subsidy requirement on federal support mechanisms; no such requirement is expressly imposed on the states.

---

[5]These Petitioners are joined by the Wyoming Public Service Commission ("WPSC"). WPSC Br. at 8.

19

Generally, when Congress includes a specific term in one provision of a statute, but excludes it in another, it is presumed that the term does not govern the sections in which it is omitted. United States v. Atandi, 376 F.3d 1186, 1188 (10th Cir. 2004) (citing Russello v. United States, 464 U.S. 16, 23 (1983)). We see no reason to disturb this cannon of statutory construction here.

To the extent this arrangement may be considered ambiguous, our review of the statute leads us to conclude that the FCC's interpretation is not arbitrary, capricious, or contrary to Congress's intent. Hammons, 323 F.3d at 1267. We agree with the Commission that, having required explicit federal support mechanisms, Congress certainly knew what language to use to impose a similar requirement on the states. We do not find, as urged by the Petitioners, that Congress's requirement that state and federal funding be "specific, predictable and sufficient," 47 U.S.C. § 254(b)(5), provides a backdoor to federal manipulation of state support mechanisms. The Petitioners' argument that implicit subsidies are inherently non-specific, unpredictable, and insufficient is unavailing. We find no support in the plain meaning of these terms or in the relevant statutory history for the Petitioners' construction.

Petitioners further urge that the Act's requirement that "[e]very telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the

20

State to the preservation and advancement of universal service," 47 U.S.C. § 254(f), requires that the states replace existing implicit subsidies with explicit support mechanisms. Otherwise, single carriers may be forced to bear a disproportionate and inequitable share of the burden in supporting their own high-cost consumers. We agree with the FCC that the plain text of the statute merely imposes an obligation on the carriers to contribute to universal service funds; it does not impose a requirement of parity with respect to internal functioning and the distribution of funds between and among carriers. Moreover, the language of the provision evidences an express commitment of the contribution issue to the states.

In keeping with the dual regulatory scheme embraced by the Act, Congress intended that the states retain significant oversight and authority and did not dictate an arbitrary time line for transition from one system of support to another. Compare Nat'l Ass'n of State Util. Consumer Advocates v. FCC, 372 F.3d 454, 459 (D.C. Cir. 2004) (holding that the Act did not require an immediate transition in federal support from implicit to explicit subsidies). Nor did Congress expressly foreclose the possibility of the continued existence of state implicit support mechanisms that function effectively to preserve and advance universal service. Under these circumstances, we will not disturb the Commission's statutory interpretation.

III.     Definition of Statutory Terms

In Qwest I, we remanded the Ninth Order with instructions that the FCC more precisely define the terms "sufficient" and "reasonably comparable," "in a way that can be reasonably related to the statutory principles." 258 F.3d at 1202. For the reasons discussed below, we hold that the FCC has failed to reasonably define these terms.

A.    "Sufficient"

Section 254(e) of the Act provides that federal universal service support "should be explicit and *sufficient* to achieve the purposes of [§ 254]." 47 U.S.C. § 254(e). On remand, the FCC defined "sufficient" in the following terms: "enough federal support to enable states to achieve reasonable comparability of rural and urban rates in high-cost areas served by non-rural carriers." Order on Remand ¶ 30. The Commission further limited the definition by stating that "non-rural high-cost support should be only as large as necessary to meet the statutory goal." Id.

As explained more fully above, the principle of "reasonable comparability" is but one of seven principles identified by Congress to guide the Commission in drafting policies to preserve and advance universal service. See 47 U.S.C. § 254(b). For instance, Congress also intended that "[q]uality services should be available at just, reasonable, and affordable rates." Id. § 254(b)(1). As we noted in Qwest I, "[t]he plain text of the statute mandates that the FCC 'shall' base its universal policies on the principles listed in § 254(b)." 258 F.3d at 1200. Under the Act, the FCC's duty is mandatory. Id. However,

22

we posited that while "the FCC must base its policies on the principles, . . . any particular principle can be trumped in the appropriate case. . . . [T]he FCC may exercise its discretion to balance the principles against one another when they conflict, but may not depart from them altogether to achieve some other goal." Id.

Petitioners Qwest and SBC argue that the FCC's definition is impermissible in that it ignores all but one principle enumerated in § 254(b). We agree. The FCC's definition of "sufficient" ignores the vast majority of § 254(b) principles by focusing solely on the issue of reasonable comparability in § 254(b)(3). The Commission has not demonstrated in the Order on Remand or the limited record available to this court why reasonable comparability conflicts with or outweighs the principle of affordability, or any other principle for that matter, in this context. The issue is more than semantic. As discussed more fully below, this failure to consider fully the Act's principles as a whole further undermines the FCC's definition of "reasonably comparable" and the cost mechanism at issue in this case.

The FCC urges that it is justified in defining "sufficient" solely in terms of § 254(b)(3) because "in general the purpose of [the federal non-rural high-cost support] mechanism is to provide enough federal support to enable states to achieve the reasonable comparability of rural and urban rates." FCC Br. at 61. This explanation is patently unpersuasive. We are troubled by the Commission's seeming suggestion that other

23

principles, including affordability, do not underlie federal non-rural support mechanisms. Moreover, the Commission can point to no support in the Act or the legislative history that would permit such a construction. Consequently, we will not countenance it here.

Petitioners also take issue with the fact that the Commission sought to further limit its definition of "sufficient" by including language intended to cap federal support at levels "only as large as necessary" to meet the statutory goal. Order on Remand ¶ 30. We are not troubled by this language in the abstract. As we explained in our previous decision, excessive subsidization arguably may affect the affordability of telecommunications services, thus violating the principle in § 254(b)(1). Qwest I, 259 F.3d at 1200. The FCC is compelled to balance the § 254(b) principles to the extent they conflict. Id. However, the FCC has failed to demonstrate that its balancing calculus takes into account the full range of principles Congress dictated to guide the Commission in its actions.

On remand, the FCC must articulate a definition of "sufficient" that appropriately considers the range of principles identified in the text of the statute.

B.     "Reasonably Comparable"

Section 254(b)(3) of the Act provides that

> [c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are *reasonably comparable* to rates charged for similar services in urban areas.

47 U.S.C. § 254(b)(3) (emphasis added).  As noted above, § 254(b)(3) provides a principle on which the FCC is to "base policies for the *preservation and advancement* of universal service."  Id. § 254(b).  In Qwest I, we ordered the FCC to more precisely define "reasonably comparable" in reference to rates charged between rural and urban areas.  258 F.3d at 1202.

In its Order on Remand, the FCC defines "reasonably comparable" in terms of a national urban rate benchmark.  Order on Remand ¶ 30.  For purposes of assessing the efficacy of non-rural support mechanisms, rural rates are presumed "reasonably comparable" if they fall within two standard deviations of the national average urban rate contained in the Wireline Competition Bureau's ("WCB") annual rate survey.  Id. ¶ 38.

The Commission predicated the establishment of an appropriate benchmark on its interpretation of Congress's intent in drafting the Act.  The FCC found it reasonable to assume that Congress was well aware of local rate variance between the states at the time it passed the Act in 1996.  Id. ¶ 40.  The Commission concedes that even it did not have

25

rural rate data available during that period. Id. However, the FCC again found it reasonable to assume that Congress was aware of the variance in urban rates at the time, on the basis of then available WCB survey information, and that Congress would not have required rural rates to be any closer to a national urban average than other urban rates. Id. Underlying this assumption is the FCC's determination that Congress considered rural and urban rates reasonably comparable in 1996. Id. ¶ 39.

The Commission based its determination that Congress was satisfied with rural and urban rate disparity on its construction of the words "preserve" and "preservation" as they appear in several provisions of the Act. See, e.g., 47 U.S.C. §§ 254(b), (d) & (f). According to the FCC, Congress's use of these words "indicated its view that the universal service mechanisms that pre-dated the 1996 Act adequately promoted universal service." Order on Remand ¶ 39. In support, the Commission cites several statements in the Congressional record. Id. n.137. The FCC further contends that had Congress not viewed rates as reasonably comparable it would have expressly directed the Commission and the states to alter the existing structure. Id. ¶ 39.

"[T]he 1996 Act is not a model of clarity." See AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 397 (1999). However, we agree with Petitioners Qwest, SBC, and Vermont that the Commission's definition of "reasonably comparable" rests on a faulty, and indeed largely unsupported, construction of the Act. As such, we hold that the FCC's

26

construction of the statute does not deserve deference and is "manifestly contrary to the statute." Center for Legal Advocacy, 323 F.3d at 1267.

We first note that in each instance that Congress employed the words "preserve" or "preservation," the terms were conjoined with "advance" or "advancement." See, e.g., 47 U.S.C. §§ 254(b), (d) & (f). Neither "preserve" nor "advance" are defined in the statute. Therefore, we must employ traditional tools of statutory construction to determine their meaning.

"Preserve" is primarily defined as "to keep safe from injury, harm, or destruction: PROTECT." Webster's Ninth New Collegiate Dictionary 930 (1991). An alternate definition includes the concept of maintenance. Id. Similarly, "preservation" may be defined as "Keeping safe from harm; avoiding injury, destruction, or decay; maintenance. It is not creation, but the saving of that which already exists, and implies the continuance of what previously existed." Black's Law Dictionary 1184-85 (6th ed. 1990). In contrast, "advance" is defined as "to bring or move forward" or "to accelerate the growth or progress of." Webster's Ninth New Collegiate Dictionary 58 (1991). "Advancement" may be defined as "progression to a higher stage of development." Id. at 59. The use of the conjunctive "and" in the phrase "preserve and advance universal service," or "preservation and advancement of universal service," clearly indicates that the Commission cannot satisfy the statutory mandate by simply doing one or the other. The

Commission is charged under the Act with concurrent duties.

As verbs, "preserve" and "advance" both take as their object "universal service." As nouns, "preservation" and "advancement" are modified by the prepositional phrase "of universal service." The Commission's construction ultimately fails because it seeks to define separately "universal service" as it applies to each verb or noun. This reading of the statutory language is unnatural. In reference to "preserve" or "preservation," "universal service" refers to the rate variance arising from the support mechanisms existing in 1996. See Order on Remand ¶ 39. In contrast, "universal service" applied to "advance" or "advancement" refers to evolving rules recognizing changes in markets and technology. Id. To the extent that the latter construct ignores the importance of continuing rate variances and the principles enunciated in § 254(b), we see no justification for this dichotomy in either the plain language of the Act or its statutory history.

The FCC's citation to inconclusive statements in the Congressional Record to support its construction is unavailing. Id. n.137. Having reviewed the body of the Congressional Record relating to the Act, we do not believe that statements by individual senators to the effect that the proposed legislation would not harm existing services can be read to freeze the assessment of reasonable comparability to a speculative variance in rates unknown in 1996 and divined through inferential leaps in logic.

"Universal service" is defined in the Act as "an evolving level of telecommunications services," taking into account those services that are essential to basic needs, subscribed to by a majority of consumers, deployed in networks, and consistent with defined policy goals. 47 U.S.C. § 254(c)(1). Implicit in this definition and the Act is access to these telecommunications services by consumers throughout the nation. Rates cannot be divorced from a consideration of universal service, nor can the variance between rates paid in rural and urban areas. If rates are too high, the essential telecommunications services encompassed by universal service may indeed prove unavailable. Thus, the Commission erred in premising its consideration of the term "preserve" on the disparity of rates existing in 1996 while ignoring its concurrent obligation to advance universal service, a concept that certainly could include a narrowing of the existing gap between urban and rural rates.

By designating a comparability benchmark at the national urban average plus two standard deviations, the FCC has ensured that significant variance between rural and urban rates will continue unabated. This assertion is borne out by the Commission's own data. In 2002, urban rates ranged from $15.65 to $35.19, with an average of $23.38. Utilizing this data, the comparability benchmark is $32.28, or 138% of the nationwide average urban rate. In Qwest I we expressed our concern that a discrepancy of 70-80% between some rural rates and urban rates might impermissibly stretch the boundaries of

29

rate comparability. 258 F.3d at 1201. Under the 2002 data, rural rates falling just below the comparability benchmark may exceed the lowest urban rates by over 100%. Even if such rural rates are compared against the national urban average, we fail to see how they could be deemed reasonably comparable, especially in light of our previous consideration.

The Commission explains its selection of two standard deviations as the appropriate benchmark on the basis that it approaches the outer perimeter of the variance in urban rates. As rural rates approach the level of the highest urban rate, the FCC believes closer scrutiny is appropriate. While there is a certain logic to this approach, the benchmark is rendered untenable because of the impermissible statutory construction on which it rests. From this perspective, the Commission's selection of a comparability benchmark based on two standard deviations appears no less arbitrary than its prior selection of a 135% cost-support benchmark. See id. at 1202-03. On remand, the FCC must define the term "reasonably comparable" in a manner that comports with its concurrent duties to preserve and advance universal service.

IV.    Funding Mechanism

In the Order on Remand, the FCC modified its non-rural, high-cost support mechanism. To determine eligibility and the amount of support that non-rural carriers in each state will receive, the Commission established a cost benchmark of two standard deviations above the national average cost per line. Order on Remand ¶ 49. Non-rural

carriers in states with average costs exceeding the national average are eligible for support under the new mechanism.

In crafting its new cost support mechanism, the FCC relied on rate data compiled in a GAO Report. Id. ¶ 49 & App. C. The GAO Report identified and compared individual rates in urban and rural areas served by non-rural carriers. Id. App. C. Applying the definition of "reasonably comparable" rates discussed above, the FCC concluded that current rates were reasonably comparable. Id. ¶ 49. The Commission then concluded that setting the *cost* benchmark at two standard deviations would adequately support the goal of ensuring reasonably comparable urban and rural rates. Id.

In that the non-rural, high-cost support mechanism contained in the Order on Remand rests on the application of the definition of "reasonably comparable" rates invalidated above, it too must be deemed invalid. On a separate note, we did intimate in Qwest I that we would be inclined to affirm the FCC's cost-based funding mechanism if it indeed resulted in reasonably comparable rates. However, we expected the Commission to return to us with empirical findings supporting this conclusion. Once again, we find no evidence in the record before us to support the FCC's pairing of rates to costs in this context. In other words, the FCC based the two standard deviations *cost* benchmark on a finding that *rates* were reasonably comparable, without empirically demonstrating a relationship between the costs and rates surveyed in this context.

31

On remand, the FCC must utilize its unique expertise to craft a support mechanism taking into account all the factors that Congress identified in drafting the Act and its statutory obligation to preserve *and* advance universal service. No less important, the FCC must fully support its final decision on the basis of the record before it.

V.      State Inducements

In Qwest I, we held that the FCC must develop mechanisms to induce the states "to assist in implementing the goals of universal service." 258 F.3d at 1204. In response, the FCC has drafted a requirement into its support mechanism for non-rural carriers requiring states to certify that rural rates within their boundaries are reasonably comparable. If they are not, the states must develop and present an action plan to the FCC indicating the state's response. If the state fails to do so, federal funds will be withheld. The Petitioners assert that the certification process constitutes an inadequate inducement. We disagree.

We are satisfied that the inducement mechanism contained in the Order on Remand adequately responds to the concerns we expressed in Qwest I. The mechanism requires a careful yearly review, and the prospect of withheld funds will certainly bring pressure to bear on the states. Petitioners have failed to proffer any evidence to suggest that the Commission's inducement mechanism will prove inadequate. As with any such mechanism, experience may indeed prove the best judge of its efficacy. The Commission

32

is in a unique position to determine what inducements are necessary to effectuate the goals of the Act. While we can envision various approaches to more effectively induce state action, given our deferential standard of review, we cannot say that the Commission's determination in this case was arbitrary or capricious. Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

Qwest and SBC further argue that the FCC's failure to adopt inducement mechanisms to specifically effect state transition from implicit to explicit support mechanisms is arbitrary and capricious given the Commission's repeated statements that implicit mechanisms are untenable in a competitive environment. This is not a case where the Commission has suspended indefinitely its prior regulations, despite acknowledging the importance and need for such action. See Public Citizen v. Steed, 733 F.2d 93, 99 (D.C. Cir. 1984). Nor has the FCC failed to act after identifying a pressing and immediate need for regulation to replace disfavored implicit subsidies. See Farmworker Justice Fund, Inc. v. Brock, 811 F.2d 613, 618-19 (D.C. Cir. 1987), vacated as moot, 817 F.2d 890 (D.C. Cir. 1987). Owing to the complex nature of this regulatory area and shared responsibility between the FCC and the states, we reject this argument. Under these circumstances, it is not our province to dictate the methods and timing employed by the agency to effect the statutory design.

VI.    Remaining Claims

Having invalidated the FCC's definitions of "sufficient" and "reasonably comparable," and further invalidated the Order on Remand's cost-support mechanism, we are unable to address the Petitioners' remaining claims with respect to the sufficiency of federal support for non-rural carriers and the industry as a whole.

## VII. Deadline for FCC Action

The Petitioners have requested that this court retain jurisdiction and impose a specific deadline of no more than 180 days for FCC compliance. The Petitioners appear to allege unreasonable delay on the part of the FCC in implementing universal service support mechanisms and in responding to this court's previous remand. Under 5 U.S.C. § 706(1), we may "compel agency action unlawfully withheld or unreasonably delayed." While this court has never had occasion to delineate under what circumstances such relief will be granted, it is clear that a court-imposed deadline for agency action constitutes an extraordinary remedy. See In re Int'l Chem. Workers Union, 958 F.2d 1144, 1149 (D.C. Cir. 1992). The U.S. Court of Appeals for the District of Columbia Circuit has set forth the following factors to guide courts in this determination: (1) the extent of the delay, (2) the reasonableness of the delay in the context of the legislation authorizing agency action, (3) the consequences of the delay, and (4) administrative difficulties bearing on the agency's ability to resolve an issue. See id. at 1149-50. To this we might expressly add consideration of the complexity of the task envisioned by a court's remand order.

While we recognize that nearly nine years have passed since the passage of the Telecommunications Act and over three years since our decision in Qwest I, we decline the invitation to retain jurisdiction or impose an arbitrary deadline. The Telecommunications Act envisions a complex transition to a competitive communications market and contains no statutory deadlines for completion of its universal service mandate. No less complex is our comprehension of the task before the FCC on remand. Redefining the statutory terms identified above and developing a support mechanism consistent with the principles identified by Congress requires the full development of an administrative record, empirical findings, and careful analysis. Under these circumstances, we will not constrain the Commission's consideration of the issues before it. We fully expect the FCC to comply with our decision in an expeditious manner, bearing in mind the consequences inherent in further delay.

Conclusion

The FCC has failed to appropriately respond to our decision in Qwest I. Accordingly, in Nos. 03-9617, 04-9518, and 04-9519 we GRANT in part and DENY in part the petitions for review and REMAND to the FCC for further proceedings consistent with this opinion.

35